**In re Joseph Stanley SITARZ,
aka Joe Sitarz, Debtor.**

**Bankruptcy No. 3–92–893.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 18, 1993.

712

Ronald J. Walsh, St. Paul, MN, for debtor.

Brad C. Eggen, Minneapolis, MN, for Richard and Joyce Ludwigson, objecting creditors.

## ORDER DENYING CONFIRMATION OF MODIFIED PLAN OF DEBT ADJUSTMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 13 case came on before the Court on June 30 and November 13, 1992, for hearing on the confirmation of the Debtor's modified plan of debt adjustment. The Debtor appeared personally and by his attorney, Ronald J. Walsh. Scheduled creditors Richard and Joyce Ludwigson and Ludwigson Floral appeared by their attorney, Brad C. Eggen. The Chapter 13 Trustee appeared by his attorney, Stephen J. Creasey. Upon the evidence adduced at the hearing, the briefs and arguments of counsel, and all of the other files, records, and proceedings in this case, the Court denies confirmation.

## PROCEDURAL POSTURE

The Debtor filed a voluntary petition under Chapter 13 on February 14, 1992. On his Schedule F, he included an entry for an unsecured nonpriority claim in favor of Richard and Joyce Ludwigson, characterizing it as "restitution" and assigning an amount of $25,000.00 to it.

In his original plan of debt adjustment, the Debtor proposed to pay the sum of $23.07 per week to the Trustee over a five-year period, to be applied to the $115,500.00 in unsecured claims that he scheduled. He did not specify a percentage distribution on account of unsecured claims. The Ludwigsons objected to confirmation of this plan on several different grounds. At an April 23, 1992 hearing, the Debtor's counsel acknowledged the gravity of the Ludwigsons' objections and stated that the Debtor would have no objection if the Court denied confirmation of the plan on file. He made these acknowledgments on the condition that the Debtor would be preparing and submitting a modified plan, restructured in light of the Ludwigsons' objections. On April 24, 1992, the Court entered an order denying confirmation of the plan. To place his new proposal before the Court, the Debtor made a motion for pre-confirmation modification pursuant to LOC.R.BANKR.P. (D.MINN.) 606(b).

That motion is the matter at bar. The modified plan is to last for five years. The Debtor proposes to pay $75.00 per month to the Chapter 13 Trustee during the period of his medically-required absence from regular employment that was in effect when he proposed the plan. Thereafter, he is to make graduated payments, starting at $100.00 per month for the remainder of the plan's first year; increasing to $150.00 per month for the second year; and capping off at $200.00 per month for the final three years of the plan. He proposes to have the Trustee apply all funds to unsecured claims. He notes in the plan that these claims would consist solely of a $30,000.00 claim in favor of the Ludwigsons and, possibly, a scheduled claim of $500.00 in favor of his former attorney.

The Ludwigsons have objected to confirmation of the modified plan on several statutory grounds, including the Debtor's alleged lack of eligibility under 11 U.S.C. § 109(e); the Debtor's alleged failure to meet the "good faith" requirement of 11 U.S.C. § 1325(a)(3); and the Debtor's failure to meet the "best efforts" test of 11 U.S.C. § 1325(b)(1)(B). The Trustee has no objection to confirmation on either the eligibility or the best-efforts grounds; he takes no position on the issue of good faith.

## FINDINGS OF FACT

The relevant events span some five years, from 1983 through 1988. In 1981, the Ludwigsons purchased an existing flower-shop business on University Avenue in Blaine, Minnesota. They were then in middle age. Richard Ludwigson had been a minister, and was then employed as a nursing home administrator; Joyce Ludwigson maintained part-time employment as a real estate agent and in retail loss

prevention. They purchased the business as an investment, with the hope of developing it to the point where it could provide them with a retirement income. They assumed and held ownership of it as sole proprietors.[1]

As between the Ludwigsons, Joyce exercised the primary responsibility for the shop. In early 1983, she hired the Debtor as a sales clerk. By early 1985, the Ludwigsons had promoted him to store manager. In that capacity, he had almost complete responsibility for the daily operation of the business, including cash management, bank deposits, and inventory acquisition. The Ludwigsons reposed almost total trust in him; they placed only two controls on his actions for monitoring and accountability. First, Joyce Ludwigson performed a daily reconciliation of the shop's till with the receipt tabulation from the cash register. She apparently reviewed few other records or transactions. Second, they expressly prohibited the Debtor from writing any checks on the store account at the First State Bank of Spring Lake Park.[2] For inventory purchases and other immediate payment obligations, he was to use cash, or bank money orders purchased with cash receipts.

The business did not make a profit during the Ludwigsons' first several years of operation.[3] They fully expected this as a normal incident of a business startup. By late 1984, however, the rate of increase in shop revenues since their acquisition was such that they expected to realize at least a small profit during calendar year 1985.

The Debtor defiled the Ludwigsons' trust for a four-month period in mid–1985, with consequences that persist to this day. As with many such abuses, it seems to have started with a benign motive. Apparently the Debtor became concerned over the sufficiency of store revenues to meet operating expenses. He began to create falsified charges using his personal VISA card, submitting them with bona fide charges, cash, and checks for deposit in the store's checking account. The submission of these charges for deposit resulted in falsely-high balances in the account. Debtor then forged Joyce Ludwigson's signature on store checks, to cover trade payables for the store and/or to obtain money orders to pay such obligations. Apparently, he exceeded the $1,500.00 limit on his VISA account within a short period of time, but he continued to submit falsified charges using it. Then he began using the store's VISA account to the same end. It was not long before he began converting the balance of funds in the store's account (both actual receipts on deposit and the illusory balances generated by the fictitious charges) to his own use—paying his own debts, purchasing assets for his own use, and making substantial cash gifts to his friends and purchases for them. This pattern of conduct mushroomed over a period of only three months. It ended in early September, 1985, when VISA USA, Inc., the central licensor and administrator of the VISA program, made chargebacks of a total of approximately $107,000.00 against the First State Bank of Spring Lake Park, for unauthorized and over-limit charges on the two VISA accounts.

The Bank's reaction was sure and swift. On September 13, 1985, it exercised its right of setoff against an account in which the Ludwigsons had deposited $11,000.00 for payment of the store's payroll and withholding taxes; it terminated the store's VISA and Master Card [4] merchant status;

1. Later, after the events relevant to this case, they formed a corporation and conducted the business through it.

2. The Debtor was never an authorized signatory on the store account; nor did the Ludwigsons ever authorize him to sign either of their names to checks drawn on the account.

3. Apparently, the losses in their first months of operation were so severe as to prompt the Ludwigsons to investigate their sellers' operations.

This revealed that the sellers had maintained double books and had produced a falsified set for the Ludwigson's review during their prepurchase evaluation. The Ludwigsons sued the sellers; this litigation resulted in a settlement under which the Ludwigsons' purchase price was reduced by a significant amount.

4. Apparently a Master Card account was involved in the Debtor's scheme in some way; the evidence does not reveal how, or whose card.

and it sued the Ludwigsons, the Debtor, the VISA and Master Card national organizations, and the member-banks through which the Debtor and the store had maintained their charge accounts. Via this suit, the Bank sought to recover at least $98,000.00 from the Ludwigsons and/or the Debtor on account of third-party checks that the Debtor had written against illusory balances in the store account and that the Bank had honored before the VISA organization made its chargebacks.

The repercussions of these events on the Ludwigsons and the shop were many. In the wake of the Bank's setoff, the Ludwigsons lacked the means to meet their obligations to the Internal Revenue Service and the State of Minnesota for withholding and payroll taxes for the second and third quarters of 1985. The taxing authorities soon assessed the taxes with penalties and interest, and filed notices of tax lien. The attachment of the tax liens to the Ludwigsons' homestead ultimately deprived them of all of the equity in their homestead; when they sold it several years later, they had to pay over all of the proceeds above mortgage-secured debt and closing costs to the taxing authorities, and they did not realize a cent from the closing. When word of the Debtor's actions and their consequences spread through the Blaine community, sales volume dropped and the shop lost business goodwill.[5] The shop posted actual losses of a total of approximately $80,000.00 for 1985 and 1986, as evidenced by business-loss deductions claimed by the Ludwigsons on their income tax returns for those years, which the Internal Revenue Service did not challenge. Shop revenues never recovered to the point where they matched operating expenses. When Richard Ludwigson received the offer of a more lucrative position in nursing-home manage-

ment in Illinois, the Ludwigsons sold the shop for $10,000.00 less than what they had paid for it,[6] and had to furnish the financing themselves via an installment sale contract. As of late June, 1992, they were still making payments on surviving trade payables from the shop; as of November, 1992, their purchasers had not yet paid them in full under the contract.

After an FBI investigation, the Debtor was prosecuted in the United States District Court for this District. He pleaded guilty to one count of bank fraud. In May, 1988, he was sentenced to 18 months' imprisonment. He also was ordered to make restitution to the Ludwigsons in the amount of $30,000.00, to be paid at the rate of not less than $6,000.00 per year commencing upon his release from custody. The Debtor served his sentence, apparently receiving some six months' credit for good behavior. Since his release, he has not made a single payment under the restitution order.

In March, 1992, the Ludwigsons settled with the Bank in the Anoka County District Court lawsuit. The Bank and the Ludwigsons divided an escrow fund established under previous court order; the Bank agreed to be responsible for any remaining third-party claims that had arisen out of the Debtor's conduct. The Ludwigsons gave up their counterclaim to recover the funds the Bank had seized through offset. The Bank assigned its claims against the Debtor to the Ludwigsons. The impending settlement and the Ludwigsons' expressed intentions to vigorously prosecute all remaining claims against the Debtor were the circumstances that prompted him to file for Chapter 13.

In June, 1992, Debtor was on a medical leave of absence from his current employment as a server and server-trainer at the

---

5. During the first part of the evidentiary hearing, the Court received the Ludwigsons' Exhibit K into evidence. This was a lengthy recapitulation of false and questionable transactions made through the store's checking and VISA accounts during the period of the Debtor's scam, prepared by the Bank for the purposes of the state-court lawsuit. Included among its numerous source documents are several queries by customers as to how double VISA or Master Card

charges had been made on their accounts, with demands for reimbursement or credit. In a smaller community like Blaine, of course, this is just the sort of thing that will get around quickly.

6. The Ludwigsons' final purchase price had been $35,000.00, after their settlement with their sellers; their sale price was $25,000.00.

Olive Garden restaurant in Roseville, Minnesota. He had held this employment for approximately 15 months, and was compensated at minimum wage. On his Schedule I for this case, he stated his current net monthly income as $754.74, after deduction of payroll insurance premiums, payroll taxes, and social security from his gross wages. On his Schedule J, he stated his current monthly living expenses as follows:

| EXPENSE | AMOUNT |
| --- | --- |
| Rent | $250.00 |
| Utilities | 25.00 |
| Food | 125.00 |
| Clothing | 25.00 |
| Laundry and Drycleaning | 15.00 |
| Transportation | 80.00 |
| Insurance | |
|   Life | 6.96 |
|   Health | 74.23 |
|   Auto | 50.00 |
| TOTAL | $651.19 |

From the resulting monthly surplus of $103.55, Debtor proposed to pay the sum of $23.07 per week to the Chapter 13 Trustee.

The Debtor was on his medical leave from employment under doctor's orders, for the condition of myocarditis. He testified that stress aggravated this condition, for which he was then under medication. Apparently, he underwent open heart surgery during the summer of 1992.[7] He is, however, a young person, still in his late twenties. There is no evidence of record as to his educational background, but his work history suggests that, at most, he graduated from high school. Before his employment by the Ludwigsons, he had been employed by the Dayton's department store chain as a retail "sales consultant" for some six months; before that he had been employed for some three years by a local restaurant-bar in several different service jobs. None of this employment has gained him more than the minimum wage, plus tips.

The Debtor has no assets of any consequence. He does not own a homestead or an automobile. He owns a nominal amount of furniture, clothing, and personal effects, which he values at a total of $1,150.00 on his bankruptcy schedules.

The Debtor testified that he had filed for relief under Chapter 13 because the Ludwigsons were pressing their lawsuit against him in the Anoka County District Court, and because he had been unable to make any payment on his court-ordered restitution. He argues, through counsel, that using Chapter 13 will be the only way he can "get his life back together."

## DISCUSSION

The nature of the facts merits an order of treatment in reverse to that argued by the Ludwigsons' counsel.

    A.   11 U.S.C. § 1325(b)(1)(B): "Best Efforts" Test.

11 U.S.C. § 1325(b) provides, in pertinent part, as follows:

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

    .    .    .    .    .

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.[8]

    .    .    .    .    .

As added to the Bankruptcy Code in 1984,[9] this provision incorporates a "best efforts" or "ability to pay" test into the Chapter 13 confirmation process. It is triggered only upon the objection of the Trust-

---

**7.** There is no evidence of record going to this point; however, both counsel acknowledged this fact at an October 9, 1992 status conference, and the Ludwigsons' counsel did not challenge the Debtor's counsel when he mentioned it in argument at the second part of the evidentiary hearing on November 13, 1992.

**8.** Section 1325(b)(1)(A) allows a debtor to avoid an inquiry into his disposable income if his plan proposes to pay a 100 percent distribution on account of all allowed claims. That provision does not apply to this case.

**9.** See Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, § 317, 98 Stat. 333, 356 (1984).

ee or of the holder of an allowed unsecured claim. *In re Cordes*, 147 B.R. 498, 501–502 (Bankr.D.Minn.1992); *In re Jones*, 55 B.R. 462, 465 (Bankr.D.Minn.1985). Upon such an objection,[10] a debtor proposing something other than a "100 percent plan" must demonstrate that his plan commits all of his "disposable income" to the payment of creditors' claims over its first three years. *In re LeMaire*, 883 F.2d 1373, 1379 (8th Cir.1989) (panel decision), *vacated*, 891 F.2d 650 (8th Cir.1990), *on rehrg.*, 898 F.2d 1346 (8th Cir.1990) (*en banc*); *In re Cordes*, 147 B.R. at 502; *In re McDaniel*, 126 B.R. 782, 784 (Bankr.D.Minn.1991); *In re Jones*, 55 B.R. at 465.

▆▆▆▆ The phrase "disposable income" is statutorily defined for the purposes of the best-efforts test; it means all income which is not committed to the reasonable, necessary business and living expenses of the debtor and his dependents. 11 U.S.C. § 1325(b)(2); *In re Cordes*, 147 B.R. at 502; *In re McDaniel*, 126 B.R. at 784; *In re Jones*, 55 B.R. at 465. In fashioning this provision, Congress was attempting to balance the claims and interests of constituencies to Chapter 13 cases; it intended that the courts take cognizance of that balance. In a Chapter 13 case, the debtor and his creditors have competing claims against the debtor's post-petition stream of income—which is, after all, the sole asset of the post-confirmation Chapter 13 estate.[11] On the one hand, unsecured creditors have a justifiable expectation of a meaningful return on their claims. *In re Cordes*, 147 B.R. at 504–505. On the other, debtors in Chapter 13 should have some reasonable latitude in determining the manner in which they will maintain and support themselves and their dependents. *In re McDan-*

*iel*, 126 B.R. at 782. In passing on a creditor's objection to specific expenses, the Bankruptcy Court must equitably balance these competing claims. For the purposes of the best-efforts test, the debtor's allowable living expenses need not be restricted to those that would maintain a "poverty level" of existence. *In re McDaniel*, 126 B.R. at 784. It is not appropriate for the Court to mandate "squeezing the last dollar" from debtors in Chapter 13. *In re McDaniel*, 126 B.R. at 784 (citing *In re Otero*, 48 B.R. 704, 708 (B.R.E.D.Va.1985)); *In re Schyma*, 68 B.R. 52, 64 (Bankr. D.Minn.1985) (ditto). On the other hand, debtors do not have an absolute right to maintain all the incidents of their past lifestyles and status in society, particularly where they were characterized by luxury, excessive consumption of nonessentials, or inordinately high expenditures for purchases of necessities. *Id.; In re Jones*, 55 B.R. at 466–467. In sum, the statute requires the Court to exercise judgment, but that exercise must be balanced, fair, and humane. The Court cannot be *overly* judgmental. Congress did not sanction the imposition of the Court's own personal values. *In re McDaniel*, 126 B.R. at 784 (citing *In re Navarro*, 83 B.R. 348, 352 (E.D.Pa.1988)). Nor did it require the infliction of a draconian penury on Chapter 13 debtors as the price of discharge.

▆▆▆▆ The Eighth Circuit has held that the creditor objecting under § 1325(b)(1) has the initial burden of producing evidence to support its contention that the debtor is not applying all of his disposable income to his plan. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir.1987).[12] The Ludwigsons

**10.** The objection may be made solely on the theory that the debtor is not proposing to comply with the "best efforts" requirement; the statute does not require that the objection be based on any independent provision of 11 U.S.C. § 1325(a) or any other applicable statute.

**11.** *See* 11 U.S.C. §§ 1306(a)(2) ("[p]roperty of the estate includes, in addition to the property specified in [11 U.S.C. § ] 541...., ... earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted ...") and

1327(b) ("[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor ..."); *In re Denn*, 37 B.R. 33, 35 (Bankr.D.Minn.1983).

**12.** The *Zellner* formulation does not take into account the several alternative bases for an initial objection under § 1325(b)(1). A comparison of a debtor's Schedule I and his plan could reveal, for instance, an unexplained and unallocated income surplus—even if one did not take issue with the nature or amount of the debtor's

have failed to carry this burden; their objection under § 1325(b)(1) is without merit. They do not point to any single category or amount of expense in the Debtor's budget as excessive or inappropriate. There are not many line entries; every single one of them represents an expenditure for a basic necessity of life, and not a one is in an amount excessive for a young single person without dependents, residing in the Twin Cities metropolitan area. The Ludwigsons' counsel asserted in closing argument that the Debtor had "vastly overstated" his expenses, but this conclusory statement is ludicrous. If the amount of the Debtor's Chapter 13 payment is added to his personal budget, and that total is deducted from the amount of his current income from employment, there is no remaining "disposable income" cognizable for the purposes of an objection under § 1325(b)(1).

In his written objection, the Ludwigsons' counsel identified another fact basis for this objection. Arguably, it also fails because the Ludwigsons failed to bear their initial burden under *Zellner;* however, some further discussion is warranted.

■■■ The gist of this other theory is that the Debtor should be earning more money and, hence, have more income to devote to plan payments. The only evidence of record suggests that he is in fact maximizing his current vocational profile, even though he is working one of the simplest of service-industry jobs and is making relatively little. Other than his management experience with the Ludwigsons' business, the

Debtor's past work experience is limited to unskilled employment. His position with the Ludwigsons might have given him upward mobility—but, during the experience, he grossly betrayed his employers' trust, crippling their business in the commission of a federal felony. The effect on his employability is obvious; it is simply fatuous to suggest that, somehow, he could now command another management position in retail sales or elsewhere. The companion assertion that he has the "physical ability" to produce more income is similarly unsupported. The innuendo is that the Debtor should be working more than one job, or working at some occupation that is physically more taxing, and, presumably, more lucrative. The only evidence of record suggests that this is just not possible; the Debtor has been the victim of a medical condition involving a major bodily system, apparently life-threatening in the past and, perhaps, still so. The Debtor's evidence on this point is neither replete, nor particularly pointed, but it is sufficient to support the inference that he is doing all that he can under his current medical limitations.

It follows from all of this that the Debtor has met the best-efforts test.

B.   11 U.S.C. § 1325(a)(4): "Best Interests of Creditors" Requirement

■■■ 11 U.S.C. § 1325(a)(4) requires the debtor seeking personal debt adjustment to show that

the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unse-

---

scheduled expenditures. This circumstance alone—*without production of evidence*—should satisfy the creditor's initial burden. If a debtor's budget contains line-entries for expense categories which should be presumptively assumed to be non-essential expenditures in the nature of luxuries, the creditor fulfills its initial burden by merely joining the objection. Either of these moves would shift the burden to the debtor, who then would have to account for the apparent surplus, or justify the expenditure. (An example of the latter would be the large private school tuition payments and support for adult, emancipated children rejected as proper expenses in *Jones,* 55 B.R. at 467.) The same delineation of burdens should prevail where the nature or amount of a scheduled expenditure is,

on its face, out of all proportion to everyday experience in the debtor's community. A more realistic formulation for the standard would impose a burden of production on the creditor only if no arithmetical discrepancies or glaring excesses appeared from the face of the debtor's Schedule I and his plan. Critics might complain that this qualification is almost as imprecise as that in *Zellner.* However, these cases are not driven by the application of technical, specialized principles; their subject matter is the stuff of everyday life. The application of simple common sense by debtors, creditors, and their counsel in reviewing the merits should enable them to adequately prepare for these issues, without fear of being blindsided at a confirmation hearing.

cured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date;

Under this provision,

[t]he relevant issue is whether a creditor would in fact receive more in a Chapter 7 liquidation than it will under the proposed Chapter 13 plan. To determine this, the bankruptcy court must value the estate property, taking into account those assets that would be beyond the reach of the creditors in a Chapter 7 liquidation. If any creditor would receive more in a liquidation, the plan may not be confirmed.

*Education Assistance Corp. v. Zellner,* 827 F.2d at 1224. *See also In re Schyma,* 68 B.R. at 59.

Under the rubric of this statute,[13] the Ludwigsons maintain that the Debtor should be committing a greater total sum to plan payments, in an amount equal to that which he dissipated by making gifts and other transactions with his friends. Apparently the Debtor has admitted that some of these transfers involved vague promises or plans of future joint business operations, from or with the recipients. The Ludwigsons insist that the Debtor should be reclaiming the money from the recipients via lawsuits "based on unjust enrichment, detrimental reliance, promissory estoppel, breach of contract, or breach of partnership agreement." Though the Ludwigsons' counsel had ample opportunity to do so by cross-examining the Debtor and otherwise, he developed precious little evidence to support this attack. The sparse evidence in the record suggests that the recipients considered the transfers to be gifts.

Even were the record stronger, however, it simply would not support an objection to confirmation. The theory wholly neglects a cost-benefit analysis. It seems to be directed solely toward a vindication of the Ludwigsons' sense of betrayal, without a nod toward the likelihood of a real, net financial realization for them and other creditors. The perfunctory use of a string of puffed and ominous-sounding legal theories of recovery certainly does not translate to success on the merits and in collection. There is no demonstrated thought as to how the prosecution of such claims would work into the administration of the Chapter 13 estate—how long the litigation would take, or how the Debtor or the estate would pay for it. Even as these transfers were being executed, their true nature was probably as murky to the participants as the Debtor's motives had been throughout his scheme. Such ambiguities, of course, would prompt meritorious denials and defenses, were the recipients of the transfers to be sued; a zealous defense would lead to extended litigation. Common sense would suggest that the money is gone forever, and that the recipients would not or could not respond to any judgment which the Debtor might obtain.

Almost certainly, counsel formulated this argument; it is the mark of a technically-minded advocate intent only on throwing out as many high-sounding impediments to his adversary as possible, without really appraising whether the case can support them. Lacking any grounding in reality, this objection must be rejected out of hand. The record otherwise demonstrates that the Debtor's Chapter 7 estate would bear no assets; the Debtor's creditors unquestionably are better off with him in Chapter 13. He has met the "best interests of creditors" requirement, then.

C. § 1325(a)(3): Good Faith Requirement.

▇▇▇ 11 U.S.C. § 1325(a)(3) requires the debtor proposing a plan of debt adjustment to demonstrate that "the plan has been proposed in good faith ..." If a creditor objects to confirmation on the ground that the debtor does not meet this element, the Bankruptcy Court must make

---

**13.** Though the Ludwigsons' counsel framed this alternate objection under § 1325(b)(1), it really sounds under 11 U.S.C. § 1325(a)(4). If the Debtor had these rights of recovery, a Chapter 7 trustee would have succeeded to them. For the inquiry on confirmation, the accountability for their value springs from the "best interests of creditors" requirement of the latter provision, rather than from the "best efforts" provision of the latter.

... a separate, independent determination ... [T]he proper inquiry should [analyze] whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The Bankruptcy Court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case.

*In re Estus*, 695 F.2d 311, 316 (8th Cir. 1982). *See also In re Schyma*, 68 B.R. at 68–69. The Eighth Circuit recently reaffirmed the applicability of this totality-of-circumstances analysis in *In re LeMaire*, 898 F.2d at 1349 (*en banc*), and in *Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992). Because the 1984 enactment of § 1325(b) subsumed most of the financially-based objections to confirmation under § 1325(a)(3) that had been recognized under *In re Estus*, the good-faith element now involves considerations of a more subjective nature. *Education Assistance Corp. v. Zellner*, 827 F.2d at 1227. They include the debtor's motivation in seeking Chapter 13 relief; the financial and personal goals the debtor would accomplish through Chapter 13; and the debtor's manifested attitude toward the integrity of the bankruptcy process. *In re Cordes*, 147 B.R. at 503. The Eighth Circuit has identified a half-dozen specific factors relevant to this inquiry:

1. Whether the debtor has accurately stated his debts and expenses on his bankruptcy statements and schedules, *Education Assistance Corp. v. Zellner*, 827 F.2d at 1227;

2. Whether the debtor has made any fraudulent misrepresentation in connection with the case, to mislead the Bankruptcy Court or his creditors, *id.;*

3. The type of debt which the debtor seeks to discharge in Chapter 13, *In re LeMaire*, 898 F.2d at 1349;

4. Whether any of the debtor's debt would be nondischargeable in a Chapter 7 case, *id.;*

5. "The debtor's motivations and sincerity in seeking Chapter 13 relief," *id.;* and

6. Whether the debtor has "unfairly manipulated the Bankruptcy Code" in any aspect of his plan, *Education Assistance Corp. v. Zellner*, 827 F.2d at 1227.

This list of factors, of course, is non-exclusive.

As evidenced by previous citations to *In re LeMaire, Noreen v. Slattengren,* and *In re Cordes,* and by other published decisions such as *In re Belden*, 144 B.R. 1010 (Bankr.D.Minn.1992), § 1325(a)(3) has received much attention recently in this District and Circuit. Of all of these decisions, *LeMaire* and *Noreen* are the most instructive to the present case.

Some years before his bankruptcy filing, the debtor in *LeMaire* had pleaded guilty to a charge of aggravated assault. He had inflicted multiple, crippling gunshot wounds on another man with the intent to kill him. He served over two years in prison for the conviction. After his victim brought a civil lawsuit for damages, the debtor stipulated to the entry of a substantial money judgment against himself. His default in payment under the stipulation led to the victim's commencement of garnishment proceedings; the garnishments prompted the debtor to file for Chapter 13. In *Noreen*, the debtor had been convicted of criminal sexual conduct against a minor. After his victim had sued for damages and obtained summary judgment on the issue of liability, the debtor filed for relief under Chapter 13—eleven days before the scheduled commencement of trial on the issue of the victim's damages. In both cases, the debtors proposed plans that provided for only modest, fractional repayment on the claims of their unsecured creditors, including the injured parties.[14]

In *LeMaire*, the Bankruptcy Court had acknowledged the heinous nature of the debtor's pre-petition acts, but concluded that all of the circumstances of his Chapter

---

**14.** LeMaire's plan provided for a distribution totalling 42 percent of the allowed amount of unsecured creditors' claims; Noreen initially proposed to pay $200.00 per month on account of unsecured claims over the three-year duration of his plan.

13 filing, case, and plan did not defeat a finding of good faith. On appeal, the Eighth Circuit noted that a debtor's attempt to subject a debt nondischargeable under Chapter 7 to adjustment under Chapter 13 did not, in itself, render the debtor's plan nonconfirmable. 898 F.2d at 1348. However, it concluded that the Bankruptcy Court had accorded insufficient weight to the nondischargeable character of this particular debt; had given too much weight to the Debtor's claim to a "fresh start" in bankruptcy, as against the creditor's right under nonbankruptcy law to compensation for his injuries; had failed to consider significant "public policy" factors implicated in the case; and had given undue emphasis to the statutory circumstance of the greater breadth of discharge under Chapter 13. 898 F.2d at 1351–1353. Concluding that the extreme maliciousness of the debtor's pre-bankruptcy conduct toward the creditor had to be a major consideration on the good faith inquiry, it rejected the evidence of good faith cited by the Bankruptcy Court as "implausible on its face," 898 F.2d at 1351, reversed, and remanded for further proceedings consistent with its opinion, 898 F.2d at 1353.

In *LeMaire,* the *en banc* court stated that its holding applied only to the narrow set of facts before it, involving an attempted murder. The panel in *Noreen,* however, had no difficulty in concluding that the same sorts of policy considerations applied to the good faith element in a Chapter 13 case where the major debt arose from a different sort of intentionally-inflicted injury, but one equally or more heinous than the one in *LeMaire.* 974 F.2d at 77, n. 6. The panel held that the Bankruptcy Court's "finding of bad faith ... [was] well supported" as an inference, by such circumstances as the timing of the debtor's filing in relation to the trial in the state court, the "targeted" nature of the debtor's request for bankruptcy relief, and the "meager payment plan, ... increased only in response to [the victim's] objection [to confirmation]." 974 F.2d at 77. Thus, it held, the Bankruptcy Court had acted properly in summarily denying confirmation, without even affording the debtor an evidentiary hearing. 974 F.2d at 76.

Obviously, then, the Eighth Circuit believes that the *LeMaire* rationale applies to more sorts of cases than just those involving a debtor's attempted murder of another person. The *Noreen* court did not suggest how much further it applied—whether, for instance, it need be limited to cases that involve particularly horrifying personal injuries, bodily or psychological. Neither of the Eighth Circuit decisions explicitly limit the rationale in this fashion, however. Common to both decisions is the notion that "public policy" should prohibit a Chapter 13 debtor convicted of a serious criminal offense on the basis of pre-bankruptcy conduct from significantly impairing the right of his victim to a civil recovery from him. *In re LeMaire,* 898 F.2d at 1351 (remarking that, in finding that the debtor did not lack good faith, the Bankruptcy Court had given undue emphasis to the statutory circumstance that discharge under Chapter 13 is broader than under Chapter 7); *Noreen,* 974 F.2d at 77, n. 6 (citing *LeMaire* to similar effect). Once the *LeMaire* rationale is pared to this essence, there is no reason why it also should not be applied to at least some cases involving the intentional infliction of serious financial injuries that had criminal consequences.

This "public policy" dimension suggests several other factors for the good faith analysis in cases where the debtor's pre-petition conduct towards the complaining creditor resulted in the debtor's criminal conviction and in a debt nondischargeable under Chapter 7. The legal and/or personal relationship between the debtor and the objecting creditor should be considered. If the relationship was a fiduciary one in a legal sense, or involved a substantial degree of personal trust in a factual sense, the causative role of a breach of that trust in the injury to the creditor bears on whether the debtor is in good faith in invoking Chapter 13. The identity of the creditor, whether institutional or individual, is certainly relevant. The personal impact of the debtor's conduct on an individual creditor, both at the time of the infliction of

the injury and in its future, is also significant. Finally, it is significant that the Eighth Circuit closely dwelled on the fact that the debtors in both cases had proposed low-percentage composition plans. The extent to which the debtor's payment proposal would make the objecting creditor financially whole, then, is another factor for consideration.

■ All of these factors, of course, reflect the fact that the good faith requirement goes to the basic policies underlying bankruptcy relief, in the most pervasive way. In examining the factors, the court must bear in mind the public policy that supports the fair and even-handed according of bankruptcy remedies to debtors whose financial distress is not attributable to misconduct on their own part, and who deal fairly and openly with the court and creditors in petitioning for relief. *In re Cordes*, 147 B.R. at 503. If the evidence suggests that the debtor does not fall into *both* categories, the case may be an appropriate one for an inference of bad faith.

■ As a general matter, it can be said that the Debtor fits the bill for the latter category. He passes all of the factors that go to a debtor's conduct in the process of a bankruptcy filing and case. While the Debtor does dispute the amount of the Ludwigsons' claim,[15] he scheduled the claim so as to afford the Ludwigsons full opportunity to participate in the case. He has always been candid about the origin and nature of the claim. There is no evidence that he has failed to schedule other liabilities or assets. To all appearances, he

has been forthcoming with the Trustee and has testified accurately to the best of his memory at all stages of the case. He has never dissembled as to what he hopes to accomplish through the case. There simply is no basis for a finding of bad faith under the *Zellner/LeMaire* factors that enforce a debtor's obligation to be fully honest during judicial and administrative process of a Chapter 13 case.

■ The analysis is not so sanguine, however, as to the factors that go to the blameworthiness of a debtor's pre-petition conduct toward an objecting creditor. The Debtor acknowledges that his debt to the Ludwigsons would be nondischargeable in a Chapter 7 case. Considering the status of the creditors as individuals of moderate means, the debt is a very large one.[16] At maximum, the Debtor's modified plan proposes a distribution of about 7 percent on account of the Ludwigsons' claim.[17] In a sense, these "objective" factors are ancillary to the main issue—in themselves, they do not compel an inference of bad faith—but they certainly militate toward one.

This leaves the remaining events, transactions, and aspects of the parties' relationship as the basis on which an inference of good faith must stand or fall. In their entirety, they require an inference of bad faith.

What the Debtor proposes is, of course, very good for him: he would remain beholden to the Trustee for small regular payments over a five-year period, and then would receive a release of all legal responsibility for his acts while an employee of

---

**15.** On March 13, 1992, the Ludwigsons filed a proof of claim, the only one filed by any creditor in this case. On it, they asserted that the Debtor was obligated to them in the sum of $200,000.00, which debt was "[p]artially secured by Restitution Order 05/19/88 in the amount of $30,000.00." The only written documentation attached to the proof of claim is a copy of their answer, crossclaim, and counterclaim in the Bank's state-court lawsuit. On October 14, 1992, the Debtor's counsel served and filed an objection to the allowance of this claim in any amount greater than $30,000.00, "on the basis that ... any claim for more than this amount is excessive and not reasonable under the circumstances of this case." Counsel set this objection on for hearing at the same time as the final

installment of the confirmation hearing. As will be seen *infra* at p. 726, n. 23, an adjudication on this claim objection is unwarranted.

**16.** As noted *infra* at p. 725, the amount of the Ludwigsons' claim is at least $108,000.00.

**17.** This assumes that the Ludwigsons hold an allowed claim of at least $108,000.00. At most, the Debtor would pay a total of $10,200.00 to the Trustee under his proposal for graduated payments. The Trustee's compensation would be deducted from this sum before any distribution to creditors. At this time, the only proof of claim on file is the Ludwigsons', so they hold the only allowed unsecured claim.

the Ludwigsons, other than that then remaining under the District Court's restitution order.[18] Looking at it as a matter of abstract dollars and cents, the proposal is not very good for the Ludwigsons. The great majority of the Debtor's debt to them would be discharged—leaving them with a permanent loss of the funds represented by that debt, and all that the possession of those funds meant for their future.[19] The Ludwigsons' loss of their homestead equity, business revenues and value, and retirement security would go almost completely unredressed.

Were the objecting creditor a large financial institution, the Debtor might have a stronger call on the Court's considerations; the Debtor likely would have had an impersonal commercial relationship with it, and it certainly would have financial resources to cushion the loss resulting from the Debtor's acts. This, of course, was not the case. The Ludwigsons entrusted the Debtor with the operation of a business that was their sole major personal investment. In their testimony, they alternated between manifestations of chagrin and cold fury, in both ways evidencing the depth of their feelings of personal betrayal.

Throughout the short duration of his scheme, the Debtor committed multiple acts of fraud on the Ludwigsons, the Bank, the national credit card purveyors, and innocent customers of the store. As things have shaken out, the Ludwigsons have borne most of the financial brunt of these acts. To be sure, they are not permanently devastated. They have not been left impoverished. Unlike the creditor-victims in *LeMaire* and *Noreen*, they do not suffer from ongoing medical disability or emotional impairment. However, the impact on their lives cannot be understated. They suffered years' worth of uncertainty during the Bank's litigation. Rather than file for bankruptcy themselves, they followed the dictates of their consciences. They are paying off the store's creditors from their own wages. All this unquestionably has set them back; it has lowered their standard of living, and it has resulted in less financial security for them after retirement, perhaps significantly less.

The Debtor does not even give lip service to any of this, focusing—as he always seems to have—on his own interests first. This is not the manifested attitude of one who seeks Chapter 13 relief sincerely and in good faith. Were his plan confirmed, the Debtor would receive substantial absolution for his financial misdeeds after five years of nominal payments. Absent his status in bankruptcy, however, the Ludwigsons would have legal recourse against him via nonbankruptcy legal process for twice that long, or more.[20] In the long run, such recourse might not net them more in-hand than they would receive from the Chapter 13 estate.[21] In any event,

18. Acknowledging the effect of 11 U.S.C. § 1328(a)(3), the Debtor admits that he cannot receive a discharge of his restitution obligation.

19. As one of his client's theories of defense, the Debtor's counsel unsuccessfully tried to establish in cross-examination that the floral shop had been losing so much money that it had been doomed to fail anyway. In this light, counsel urged, the Ludwigsons were no more out by the Debtor's actions than they would have been otherwise. The theory ignores the extent to which the Debtor converted the shop's revenues, real and contrived, to his own use. It also fails to recognize the Ludwigsons' right to be informed of the ongoing losses—if any there were—and their absolute right as owners to limit or stop them by making changes in operations or even closing the shop. In a way, the Debtor's counsel tries to cast his client as having obtained a necessary, if involuntary, extension of credit for the benefit of the business. Given the massive disruption he actually caused, he did nothing of the sort.

20. Under Minnesota law, a civil judgment survives, and the statutory lien securing it is enforceable, for a period of ten years after the docketing of the judgment. Minn.Stat. § 548.09 subd. 1. The judgment may be "renewed" by an independent action upon the judgment, but such an action must be commenced within the ten-year period. *See* Minn.Stat. § 541.04. If the independent action is not timely commenced, the original judgment lapses, and becomes unenforceable. *Gaines v. Grunewald*, 102 Minn. 245, 247, 113 N.W. 450, 451 (1907). *See also Tharp v. Tharp*, 228 Minn. 23, 27, 36 N.W.2d 1, 3–4 (1949); *Nazarenko v. Nazarenko*, 362 N.W.2d 1, 2 (Minn.Ct.App.1985).

21. At this time, they would receive little or nothing. Under Minn.Stat. §§ 550.37 subd. 13 and 571.55, the Debtor's wages currently would be

however, they will have to live with the financial consequences of his wrongdoing for the rest of their lives. Given all of the circumstances, the Debtor has shown no compelling reason why he should not have to also, as a matter of both moral and legal responsibility. Where, as here, the sole debt to be adjusted directly resulted from the betrayal of a close personal relationship, the breach of strong personal trust, and felonious conduct in that breach, the proposal to obtain a discharge under Chapter 13 amounts to an unfair manipulation of the Bankruptcy Code.

The Debtor, then, has failed to meet the "good faith" requirement, and the Court cannot confirm his plan.

### D. 11 U.S.C. § 109(e): ELIGIBILITY FOR CHAPTER 13 RELIEF

11 U.S.C. § 109(e) provides, in pertinent part, as follows:

> Only an individual with regular income that owes, on the date of the filing of the [Chapter 13] petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000, ... may be a debtor under chapter 13 of [the Bankruptcy Code].

This provision limits eligibility for relief under Chapter 13 to individuals whose debt structure falls below the levels fixed in the statute. H.R.REP. No. 595, 95th Cong. 1st Sess. 319–320 (1977) U.S.Code Cong. & Admin.News 1978, p. 5787 (limitation on amounts of debt was imposed as legislative trade-off for extension of Chapter 13 remedy beyond class of "wage earners," to whom relief under Chapter XIII of Bankruptcy Act of 1898 was limited). The Ludwigsons argue that the total of the Debtor's unsecured debts is above the statutory maximum and, hence, he has no right to Chapter 13 relief. In response, the Debtor argues that the only past "liquidation" of the Ludwigsons' claim was done in the District Court's restitution order; he maintains that, in the absence of countering

proof from the Ludwigsons, the claim should be fixed at this amount for eligibility purposes.[22]

■■■■■■ The Ludwigsons, however, have produced such evidence: the comprehensive recapitulation of the check- and credit card-related losses that resulted from the Debtor's misconduct, received into evidence as Ludwigson Exhibit K. The Bank prepared this document to evidence the calculation of its claim against the Ludwigsons and the Debtor. Since the Ludwigsons now hold all of the Bank's claims against the Debtor, this exhibit evidences the liquidated amount of at least a portion of their claim against the Debtor. For the purposes of Chapter 13 eligibility, a debt is "liquidated" if it "is capable of ascertainment by reference to an agreement or by simple computation." *In re Wenberg*, 94 B.R. 631, 633 (Bankr.9th Cir.1988) (quoting *In re Bay Point Corp.*, 1 B.C.D. 1635 (D.N.J.1975)), *aff'd*, 902 F.2d 768 (9th Cir. 1990). *See also In re Claypool*, 142 B.R. 753, 754 n. 2 (Bankr.E.D.Va.1990) ("liquidated" "mean[s] ... certain as to amount, regardless of whether the debtor disputes ultimate liability"). The exhibit collates a large number of the false VISA charges and unauthorized checks created by the Debtor during his scheme. The totalling of them is a somewhat lengthy process, but it still is a simple one—and it establishes a claim in the amount of approximately $97,-000.00. As both of the Ludwigsons testified, this figure does not include the amount of the loss they occasioned when the bank offset the tax-escrow account, which was $11,000.00. These two components total approximately $108,000.00. It does not matter that the Debtor disputes his liability for any amount over $30,000.00. A disputed unsecured claim is properly aggregated with undisputed unsecured claims to arrive the total of a class of debt for an eligibility determination under § 109(e). *See, e.g., In re Albano*, 55 B.R.

---

exempt from garnishment in the amount of $170.00 per week.

**22.** The Debtor has based his objection to the Ludwigsons' filed claim on this theory as well.

Essentially, he says that the burden is on the Ludwigsons to produce evidence to liquidate their claim in any amount greater than that fixed in the restitution order.

363, 368 (N.D.Ill.1985); *In re Vaughan*, 36 B.R. 935, 938–939 (N.D.Ala.1984), *aff'd without opin.*, 741 F.2d 1383 (11th Cir. 1984); *In re Hutchens*, 69 B.R. 806, 811 (Bankr.E.D.Tenn.1987); *In re McMonagle*, 30 B.R. 899, 903 (Bankr.S.D.1983).

■ The Ludwigsons' right to recover on this claim is not legally or contractually contingent on any other act or event. If one adds its minimum liquidated amount to the amount ($500.00) of the other scheduled unsecured debt, the total exceeds $100,-000.00 by some margin. Clearly, then, the Debtor is not eligible for Chapter 13 relief. This is an additional ground for denial of confirmation of his plan.

### CONCLUSION

The upshot of all of this is that the Debtor has no refuge in Chapter 13; the Court cannot confirm the plan at bar, probably cannot confirm *any* plan which does not provide for a much larger return to the Ludwigsons on account of their claim, and cannot entertain any other plan from Debtor so long as the total of his unsecured debts exceeds $100,000.00.[23]

■ Dismissal of this case would seem to be most appropriate, as a next step. However, as this Court probably lacks the authority to dismiss the case *sua sponte*, *Noreen v. Slattengren*, 974 F.2d at 76 n. 4, that will have to await voluntary action by the Debtor, or a motion by a party in interest.

IT IS THEREFORE ORDERED that confirmation of the Debtor's modified plan of debt adjustment, as filed on May 8, 1992, is denied.

---

**23.** These conclusions moot the Debtor's objection to the Ludwigsons' filed claim, at least for now. There simply is no need for this Court to fix and liquidate their claims for various sorts of consequential damages, if those claims are not to be subjected to adjustment through the bankruptcy process. If the Ludwigsons wish further legal relief against the Debtor, they will have to obtain it in the state courts. This may mean additional delay, and greater cost and aggravation for the Ludwigsons. However, they cannot have it both ways: if, as they correctly insist, the Debtor has no remedy here, this Court has no business giving them the benefit of a full adjudication on their pre-petition causes of action under state law.