**In re Dwight Lealon JOBE, Mary Evelyn Jobe, Debtors.**

**Bankruptcy No. 95–61044–LK.**

United States Bankruptcy Court,
W.D. Texas,
Waco Division.

May 28, 1996.

824

W.B. Phillips, Killeen, TX, for Debtors.

Ray Hendren, Trustee, Austin, TX.

## MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

The Court held a hearing on March 20, 1996, on confirmation of Debtors' Proposed Chapter 13 Plan which was objected to by Jack Nestor, an unsecured creditor. Jack Nestor appeared pro se. After hearing the arguments of the Trustee, Nestor, and counsel for the Debtors, as well as the testimony of the witnesses, the Court took the matter under advisement. Upon the record established at the hearing and the Court's own independent research, this Memorandum Opinion is issued as written findings of fact and conclusions of law under Bankruptcy Rule 7052.

### Findings of Fact

1. The Debtors filed a Chapter 13 bankruptcy petition on September 5, 1995.

2. The Debtors' Schedules reflect that they exempted a 136.795 acre farm and various other items, including four automobiles, a tractor, and two mobile homes (apparently without any objection having been made).

3. No livestock, pets, crops, farm supplies, chemicals or feed were listed on the schedule of personal property or of exemptions. However, the list of creditors reflects several unsecured debts for veterinary expenses, as well as for feed and farm supplies.

4. The Debtors stated on their Schedules that they had no interests in IRA, Keogh, or other pension or profit sharing plans. This was false. In fact, Mr. Jobe has a retirement pension from the U.S. Army.

5. The Debtors stated on their Schedules that they had no accounts receivable. This was false. In fact, they had loaned a nephew $4,000.00 in 1994, and had never been repaid.

6. The Debtors stated on their Schedules that they had no insurance policies. This was false. In fact, Mr. Jobe had several insurance policies he had not listed. In 1994 he had surrendered the cash values for approximately $1,500.00. This income appears not to have been included in their joint income for 1994 as shown on their Statement of Financial Affairs.

7. The Debtors stated on their Statement of Financial Affairs that they had no income other than from employment or operation of business. This was false. In fact, in approximately March of 1995 they had received a $5,000.00 one time cash payment from John Rosten for a five year cattle grazing contract. This income appears not to have been included in their joint income for 1995 as shown on their Statement of Financial Affairs.

8. On October 12, 1995, the Debtors filed their Chapter 13 Plan ("Plan"). Their plan proposes to pay 4%[1] to unsecureds. The Plan creates a special class of unsecureds that will receive 100% of their claims. That class is composed solely of the Killeen Teachers Federal Credit Union, the third largest unsecured creditor. There are three separate claims in this class totaling almost $7,800.00. Mrs. Jobe is employed by the Killeen Independent School District.

9. The total of unsecured, non-priority filed claims in the case is approximately $56,274.00. The largest unsecured creditor is

---

1. The plan proposes to pay 4% to unsecureds. However, at the confirmation hearing the Trustee stated that the dividend to unsecureds would be approximately 17%.

the IRS, which has filed a claim for $35,-710.00.

10. In the Debtors' Schedules Jack Nestor is listed as an unsecured, non-priority creditor in the amount of $8,000.00. Nestor asserted that his claim should be secured.

11. On January 22, 1996, the Debtors filed an Objection to the Secured Claim of Jack Nestor ("Objection to Claim"). The Debtors objected, not to the claim itself, but to its treatment as secured. Jack Nestor responded by letter. That letter was docketed as a response to the Objection to Claim and filed on February 6, 1996.

12. On March 20, 1996, at the hearing on confirmation of the Debtors' Plan the Court granted the Debtors' Objection to Claim.

13. On March 5, 1996, the Trustee filed an Objection to Confirmation of Debtor's Proposed Chapter 13 Plan ("Objection"). The basis for the Objection was that the Debtors had not met the disposable income test. The Trustee withdrew his Objection after the Debtors testified at the hearing on confirmation.

14. In 1994 Jack Nestor lent the Debtors $8,500.00. A promissory note was executed with a term of 30 days. The loan was used by the Debtors' as a down payment on their homestead, a 136 acre farm.

15. Jack Nestor was entitled to a purchase money security interest in the Debtors' homestead. As such, he would have been a secured creditor. However, the parties, neither of whom was represented by counsel, failed to properly secure the loan.

16. The Debtors failed to timely repay the promissory note.

17. On June 25, 1994, the loan was reorganized. Mr. Jobe promised to pay Nestor all of the weight gain proceeds received from sales of cattle.

18. In 1994 Mr. Jobe entered into two such cattle gain contracts.

19. Mr. Jobe received $4,000.00 in proceeds from the first cattle gain contract. He failed to pay any of the proceeds to Nestor. Instead, he lent the money to his nephew.

20. Mr. Jobe then promised Nestor that he would repay the loan with proceeds from the sale of his wife's property in California. In fact, his wife owned no such property. It had been turned over to the co-obligor on the note, Jack Hill, in 1971–72 in return for Hill's assuming the payments.

21. Mr. Jobe has had several opportunities, besides the cattle gain proceeds, to make repayment to Nestor. He has chosen not to do so. He received $1,500.00 from the cash surrender values of insurance policies in 1994. He received $5,000.00 for cattle grazing rights in 1995. In addition, he testified that the farm has other income making potential, other than the grazing contract, but he has not pursued any of them.

Mr. Jobe is physically fit and in his early 50's. He is employable, but has not actively sought employment. He prefers instead to sit at home and draw his Army retirement pay while his wife works and he proposes to pay 4% to unsecured creditors.

*Issues*

1. Have the Debtors met the "Best Efforts" test of 11 U.S.C. § 1325(b)(1)?

2. Have the Debtors filed their Chapter 13 Plan in good faith under 11 U.S.C. § 1325(a)(3)?

*Conclusions of Law*

1. *The "Best Efforts" test under 11 U.S.C. § 1325(b)(1).*

██ The Eighth Circuit in *In re Estus* established a non-exclusive list of factors that are relevant in determining the "good faith" of the debtor under the "totality of the circumstances" of the case.[2] However, in 1984 the Bankruptcy Code was amended to in-

---

**2.** Those factors are: 1) the amount of proposed payments to creditors; 2) the debtor's employment history and earning capabilities; 3) the duration of the plan; 4) the accuracy of information in the plan; 5) whether there is preferential treatment between creditors; 6) whether the plan modifies secured claims; 7) type of debt sought to be discharged; and, 8) whether the debtor has filed bankruptcy before. *In re Estus*, 695 F.2d 311, 315 (8th Cir.1982). See also, *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226, 1227 (8th Cir.1987) and *In re LeMaire*, 898 F.2d 1346, 1348–49 (8th Cir.1990).

clude 11 U.S.C. § 1325(b). This provision "subsumed most of the financially-based objections to confirmation under § 1325(a)(3) that had been recognized under *In re Estus*". *In re Sitarz,* 150 B.R. 710, 721 (Bankr.D.Minn.1993). See also, *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987). One of the *Estus* factors, i.e. the debtor's employment history and earning capabilities, is pertinent to the case at hand, but arguably is financially-based. Even so, some courts have continued to apply all the *Estus* factors in determining "good faith" under Section 1325(a)(3). *Matter of Strauss,* 184 B.R. 349 (Bankr.D.Neb.1995); *Matter of Tobiason,* 185 B.R. 59 (Bankr. D.Neb.1995). Many other courts have opted to apply the Section 1325(b) "best efforts" or "ability to pay" to pay test when considering financial factors. *Sitarz,* 150 B.R. at 717; *Zellner,* 827 F.2d at 1227; *In re Killough,* 900 F.2d 61, 64 (5th Cir.1990); *In re O'Brien,* 181 B.R. 71, 75 (Bankr.D.Ariz.1995); *In re Heath,* 182 B.R. 557, 559 (9th Cir. BAP 1995) citing, *In re Anderson,* 21 F.3d 355 (9th Cir.1994); *In re Dunning,* 157 B.R. 51 (Bankr.W.D.N.Y.1993). This Court considers ability to pay equally relevant under both.

Section 1325(b) states,

"(1) If the trustee or holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(B) the plan provides that all the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan."

11 U.S.C. § 1325(b)(1)(B).

■ Thus, the Trustee or holder of an unsecured claim must object before the Court can apply the "best efforts" or "ability to pay" test. *Heath,* 182 B.R. at 560; *Sitarz,* 150 B.R. at 717. Jack Nestor has objected to confirmation. As such, these Debtors must be scrutinized to determine if they have met the "best efforts" requirement.

■ That test requires that all of the debtor's projected disposable income for a three-year period must be applied to the plan. If not, the debtor has not used his "best efforts".

The objecting party has the initial burden of establishing that the plan proposes less than full payment of the creditor's claim. 11 U.S.C. § 1325(b)(1)(A). See also, *Zellner,* 827 F.2d at 1226; *Sitarz,* 150 B.R. at 718. Clearly that is the case here as 4% is less than full payment.

■ Once that is established the debtor must show that all his projected disposable income has been dedicated to the plan. *Killough,* 900 F.2d at 64; *Zellner,* 827 F.2d at 1226; *Sitarz,* 150 B.R. at 718. Thus, what is encompassed in the definition of "projected disposable income" becomes crucial.

The term "disposable income" is statutorily defined in pertinent part as,

"(2) . . . income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor;"

11 U.S.C. § 1325(b)(2)(A).

■ However, in the "best efforts" test the question is not actual disposable income, but *projected* disposable income. *Anderson,* 21 F.3d at 358. As the Bankruptcy Appellate Panel for the Ninth Circuit has stated,

"[t]he Anderson opinion does not appear to prohibit means other than the "monthly income times 36" test for calculating a debtor's projected disposable income, but it clearly requires that *future income be subject to some showing of projectability.*" (Emphasis added).

*Heath,* 182 B.R. at 559.

Thus, certain future wages necessary for the execution of the plan constitute "projected disposable income". *O'Brien,* 181 B.R. at 75.

The Fifth Circuit in the *Killough* case has held that possible future overtime pay was not sufficiently certain enough, in that case, to include it in "projected disposable income". The Fifth Circuit said,

"... while cases exist where overtime has been included as projected income for Chapter 13 purposes, in this case, the bankruptcy court appears to have determined that the potential for Killough to work overtime in the future was not definite enough to follow this route. Given Killough's testimony on this point and our perusal of the record, we hold that such determination was not clearly erroneous."

*Killough*, 900 F.2d at 65.

Even so, the Fifth Circuit recognized that, "... there may be instances where income obtained through working overtime can and should appropriately be included in a debtor's projected and disposable income for the purposes of a Chapter 13 plan."

*Killough*, 900 F.2d at 66.

One court has distinguished *Killough*. In *Dunning* the bankruptcy court found evidence that the debtors' net disposable income may have increased, but the debtors had not passed that benefit along to creditors. There the debtors were self-employed. Consequently, their gross earnings were dependant on their desire to work. Although their income fluctuated, the

> "[p]resent evidence of increased earnings here is not like the case of a wage-earner's "uncertain" or "speculative" prospects for "overtime" or promotion, that courts have said could be ignored for section 1325 purposes; see *In re Killough*...." (Citation omitted).

*Dunning*, 157 B.R. at 53.

Thus, clearly the capacity of the debtor to earn more money and, thereby, pay more in plan payments has been a factor that the Fifth Circuit and other courts have considered. *Killough*, 900 F.2d at 65; *Dunning*, 157 B.R. at 53; *Sitarz*, 150 B.R. at 719.

■ This is an evidentiary question to be determined on a case by case basis. In *Killough* the debtor established that the possibility of overtime pay was not a certitude and, therefore, could not be projected. In

*Sitarz* the debtor refuted the creditor's contention that the debtor should be earning more money because he was physically capable of doing so. There the debtor showed that he was "maximizing his current vocational profile". He could not obtain more lucrative employment because he had embezzled money from the creditor, his former employer. Further, he could not work more than one job or at a more taxing, but lucrative employment because he established that he had a on-going medical condition severe enough as to be life-threatening in the past and, possibly, in the future.

Here, however, the record is silent as to a medical condition or a negative employment history that would preclude Mr. Jobe from increasing his income by getting a job. Quite the contrary. He is relatively young and able-bodied with no medical problems. He has had a successful career in the U.S. Army and, therefore, has marketable skills. Mr. Jobe has testified that he has no crops to tend or livestock of his own on his farm. In addition, although the Debtors reside in a rural area, they are within easy commuting distance of a metropolitan area, Killeen, Texas. Mrs. Jobe, in fact, works for the Killeen Independent School District. Quite obviously there also exist employment opportunities for Mr. Jobe in a metropolitan area of this size. Sitting idly by on a farm, the down payment for which was advanced by one's second largest unsecured creditor, and collecting "early" retirement pay from the Army while offering unsecured creditors 4¢ [3] on the dollar hardly strikes the Court as one's "best efforts".

For the foregoing reasons this Court holds that the Debtors' have not met the "best efforts" test of 11 U.S.C. § 1325(b)(1)(B). The possibility of additional income from Mr. Jobe's employment, any employment, is a certitude. Mr. Jobe is physically capable of increasing his income, but has chosen not to do so even though he has no medical or other constraints to doing so.

---

3. Whether the dividend to unsecureds amounts to 4%, as proposed, or 17%, as testified to by the Trustee, quite clearly unsecureds could be paid 100% if Mr. Jobe obtained even minimal employment. As the plan is presently, the Debtors are already paying their 3rd largest unsecured creditor 100¢ on the dollar. After the IRS and Nestor, the amount owing the remaining unsecureds is insignificant.

2. *Good faith under 11 U.S.C. § 1325(a)(3).*

■ The Debtors' testimony, as well as the Court's own independent review of the Debtors' Schedules and Statement of Affairs, calls into question the Debtors' motivations and sincerity in seeking Chapter 13 relief, as well as the accuracy of their Schedules and Statement of Affairs.

Section 1325 states,

"(a) ... the court shall confirm a plan if—
(3) the plan has been proposed in good faith and not by any means forbidden by law;"

11 U.S.C. § 1325(a)(3).

■ All debtors must comply with the "good faith" requirement of Section 1325(a), even if no objection is filed. *Heath,* 182 B.R. at 560. Thus, the court can sua sponte consider the totality of the Debtors' conduct, both before and after the plan has been submitted. This good faith inquiry is intended to prevent an abuse of the provisions, purpose or spirit of Chapter 13. If the Court discovers unmistakable manifestations of bad faith, confirmation must be denied.

The Schedules reflect that the Debtors have exempted a 136.795 acre farm and various other items, including four automobiles, a tractor, and two mobile homes. No objection was made by the Trustee or any creditor to these exemptions, although arguably one could have done so.

Under the Texas Property Code the Debtors are entitled to exempt a vehicle for every adult member of the family. The Jobe's have two adult daughters, one of whom is married. Thus, an exemption for four vehicles is suspect.

The Debtors have exempted *two* mobile homes on their farm. Part of the $5,000.00 cattle grazing money was spent in moving the second prefab home onto the property in 1995 prior to the bankruptcy filing. This exemption is suspect.

No livestock, pets, or crops were listed on Schedules B or C. However, the list of unsecured creditors shows amounts owing to veterinarians and to farm feed and chemical suppliers.

The Debtors had several material omissions from their Schedules and Statement of Affairs. They failed to report income from previous years, failed to report accounts receivable, failed to report the existence of insurance policies, and failed to report a retirement pension plan.

Mr. Jobe's financial dealings with Nestor, by his own testimony, clearly indicated a pattern of misrepresentation, dishonesty, and manipulation. Despite repeated opportunities (and representing that he would) to make some sort of repayment to Nestor, he has chosen not to. The Debtors could have secured the loan, but have not and do not intend to. The Debtors could have treated Nestor as a special, unsecured class, as they did the Killeen Teachers Federal Credit Union. However, they have chosen not to.

Mr. Jobe has made no effort to produce additional income from his farm, although he has testified he could do so successfully. He has made no effort at his own employment, although he is still relatively young, is able-bodied, and is quite obviously employable.

■ Under 11 U.S.C. § 1325(a) a debtor is required to propose his plan in "good faith". Mr. Jobe's lack of, or minimal, effort is a factor in determining "good faith".

Even so, that factor is not the sole reason for this Court's decision. The Court has looked at the "totality of the circumstances" present in this case as outlined above. Minimal effort combined with multiple misrepresentations by the Debtors in their Schedules and Statement of Affairs are unmistakable manifestations of bad faith. Further, the Debtors' prior dealings with and consistent misrepresentations to Nestor, the exemptions claimed, and their creating a preferred unsecured class, Mrs. Jobe's employer's credit union, while not per se illegal, taken as a whole compel this Court to the conclusion that the Debtors' Plan is not confirmable as it is not proposed in "good faith" under 11 U.S.C. § 1325(a)(3).

An Order of even date herewith will be entered in accordance with this Court's memorandum opinion.