**In re Wendell James VAUGHN, Billie June Vaughn, d/b/a Midwestern Food Stores & Feldman Dairy, Inc., Debtor(s).**

**Bankruptcy No. 1–82–01244.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

March 25, 1983.

Richard Wentz, Covington, Ky., for Meyer Dairy.

Paul E. Lukey, Cincinnati, Ohio, for debtors.

William R. Schumacher, Cincinnati, Ohio, Trustee.

---

**8.** Interim Bankruptcy Rule 4001(a) makes specific reference to § 362(e) of the Code.

### DECISION

BURTON PERLMAN, Bankruptcy Judge.

In this Chapter 13 case, the only creditor to be paid through the plan, H. Meyer Dairy Company, has filed an objection to confirmation of the plan. In our prior Decision and Order entered January 13, 1983, 26 B.R. 486, we dealt with such objection, but were unable to reach a final conclusion because, as we said at p. 489 of that Decision and Order, there still remained questions of fact to be determined in an evidentiary hearing. These relate to the amount of indebtedness by debtors to Meyer Dairy, as well as a valuation of the interests of the Vaughns in their Happy Time Enterprise. It is necessary to ascertain the amount owed by these debtors to Meyer Dairy, first so that the amount of their claim to be paid through the plan will be correct, and second, as one of the factors in determining the major question before us, that is, whether the plan proposed meets the best interest of creditors test contained in 11 U.S.C. § 1325(a)(4). In our prior Decision we reached the conclusion that funds paid to Meyer Dairy by Chapter 11 debtor Midwestern Food Stores, Inc., the primary obligor on the indebtedness now applicable, at least in part, to these debtors, must be applied pro-rata among the debts for which the collateral was security. As stated at p. 488 of our earlier Decision:

> ... there were three sorts of indebtedness owing by Midwestern to creditor: (1) a note, (2) an open account (which debtors call indebtedness on after acquired inventory), and (3) rent. It is further not disputed that the first and third items, note and rent, were secured by personal guarantees of debtors. The open account was not.

Before the pro-rata allocation of proceeds of liquidation of collateral of Midwestern can be made, a firm figure must be derived for each of the three items in the foregoing quotation. That was one of the primary purposes of the hearing to which the present decision is directed.

### 1. Establishing the Indebtedness.

At that hearing there were stipulations by the parties. First, it was stipulated between the parties that the total amount realized by Midwestern on liquidation of collateral and from other sources, which amount is to be the subject of the pro-rata allocation of the three types of indebtedness owed to Meyer Diary, was $39,343.05. It was the contention of the creditor that certain expenses totalling $255.00 (exterminator $125.00; building security $67.50; and building boarding up $63.00) were expenses incurred by Meyer Dairy in the protection and maintenance of its collateral. These expenses had to do with the Southern Avenue store, one of the three purchased by Midwestern from Meyer Dairy. The building on Southern Avenue had a first and a second floor. The entire building was owned by Meyer Dairy. Midwestern had only the first floor, while the second floor was a residential apartment which was rented by Meyer Dairy to a tenant. The testimony at the hearing made it clear that all three items comprising the $255.50 charge for expenses was for the benefit not only of the first floor tenant Midwestern, but also of the residential tenant on the second floor as to which Midwestern had no relationship whatever. Creditor, the proponent of this charge, has the burden of proof with respect to it. Because creditor made no allocation of the charge, there is a failure of proof of what is due creditor and it fails in respect to it.

At the hearing the parties further stipulated that the indebtedness in the first category in the above quotation, that on the note, totalled $42,175.21 (consisting of $39,898.03 principal and $2,277.18 interest to the date of filing, May 1, 1982.)

The parties were, however, in sharp dispute as to the indebtedness on the open account. Creditor asserted that the indebtedness for this item was $18,412.11, while debtor said that it amounted to $10,386.10. The difference between these two figures is explained by the respective views of the parties as to the terms of their ongoing business relationship. That is, Midwestern

operated retail stores and purchased dairy products for those stores from Meyer Dairy. The terms of this relationship were set forth in a letter agreement (JX–6) in which Meyer Dairy undertook to sell its dairy products to Midwestern "on the same price list as Convenient Food Stores Inc." The letter stated additionally that a copy of the "current price list is attached to this letter." The letter also included payment terms as well as the following:

Should you (Mid-West) ever receive a better offer from another dairy you agree H. Meyer Dairy Co. shall be given first right of refusal by Mid-West.

In fact, Meyer Dairy did thereafter sell dairy products to Midwestern in accordance with the terms of its price list for Convenient as was from time to time effective. It is also a fact that Meyer Dairy departed from that price list in selling product to Convenient Food Stores and did not give Midwestern the benefit of those reductions. The evidence on behalf of Meyer Dairy was that these reductions were for special promotions on certain items. The date of the letter agreement was May 1, 1980. For the period when the letter agreement was in effect, May 1, 1980 to November 15, 1981, the actual dollar difference which would have resulted had Meyer Dairy extended to Midwestern the prices for promotions extended to Convenient Foods was $892.85.

Because Midwestern failed to adhere to the payment standards contained in the agreement, Meyer Dairy regarded it as terminated November 15, 1981, and thereafter billed Midwestern at a higher rate than Convenient. It is this change in billing practice which accounts for the largest part of the disparity between the views of creditor and debtors on the open account item.

After carefully reviewing the record before us, we conclude that Meyer Dairy is entitled to prevail on the issue as to open account. The major difference between the two figures advanced by the parties is accounted for by the increased price charged by Meyer Dairy to Midwestern after November 15, 1981 because Midwestern had failed to adhere to the payment provi-

sions of the letter agreement. Meyer Dairy was within its rights in regarding the letter agreement as terminated by reason of the breach in this respect by Midwestern. It was entitled thereafter to charge at a different rate than that of the Convenient Market price list. Further, the record indicates that it is industry practice to extend special prices for promotional items, and we see no reason upon which Midwestern could reasonably complain because of these expectable, and not very great, departures from the Convenient Market price list in selling to Midwestern. The amount due to this difference, $892.85, over a fifteen month period does not suggest that the original agreement was made in bad faith.

■ The third and final category of indebtedness of Midwestern to Meyer Dairy was rent. What is involved is a claim for rent for the Southern Avenue store. Midwestern was in occupancy there pursuant to a lease entered into with Meyer Dairy dated May 1, 1980. This lease provided for an initial two year period during which the monthly rental would be $275.00 per month payable on the first day of the month. The lease provided for subsequent two year periods at escalating rentals. The lease provided (para. 13) that additional two year terms would commence automatically if lessee were not in default or if lessee gave proper notice of an intention not to renew. Midwestern was current with its rent through January 19, 1982. Meyer Dairy here asserts a claim for rent for the period subsequent to that date and through February 1, 1983. Thus, Meyer Dairy says that it is entitled to $1,147.38 rent for the period February through May 1982 and $2,901.42 for the period May 1982 through February 1983. In addition, Meyer Dairy asserts a claim for expenses in connection with the lease of the Southern Avenue store totalling $3,526.87. This includes $1,665.00 in lost rent as well as various utility charges. All of the foregoing relates to the Southern Avenue store. The lost rent item refers to the rent not obtained upon the vacating of the second floor apartment by the tenant. The record here established that Meyer Dairy obtained a restraining order in the

state court of Kentucky on January 12, 1982 which effectively shut down the operation of the Southern Avenue store. It was the testimony of Vaughn that after that order, Midwestern never attempted to conduct its retail operation at that store again. The utilities for the building, gas and electric and water were on single meters for the entire building. This meant that when Midwestern failed to pay utility bills, utilities for the upstairs residential tenant were cut off and this caused the vacation of the premises by the tenant. Among the charges Meyer Dairy seeks to recover are costs of reactivating utility services.

It is our conclusion that Meyer Dairy is not entitled to the amount it seeks by way of recovery under its lease of the Southern Avenue premises, at least in the amount sought. Meyer Dairy seems to have taken the position that it is entitled to rent under its lease notwithstanding the fact that it knew that Midwestern was not operating its store. Indeed, Meyer Dairy had caused that situation to occur. This attitude is inconsistent with the well established doctrine requiring mitigation of damages. That doctrine requires that in order to be entitled to recovery of rent for the extended period for which it seeks it, Meyer Dairy must show that it made efforts to find another tenant. There is no such showing. We therefore limit the amount allowed on account of rent to that appropriate for a four month period, $1,147.38. In respect to the expense items totalling $3,526.87, Meyer Dairy bases its contention that it is entitled to these amounts on the lease which this creditor says "clearly indicates that they (Midwestern) were responsible not only for the rental but also for the up-keep of the property." Meyer Dairy does not refer us specifically to where it finds this in the lease agreement, and our review of that document discloses no such contractual obligation as would support the expense claims asserted by this creditor. Furthermore, no effort is made to allocate any expense claim as between the premises occupied by Midwestern, and that portion of the premises occupied by a residential tenant. There is no contractual basis for consequential damages in the nature of lost rent. According-

ly, we disallow all of the expense items asserted by Meyer Dairy. Meyer Dairy seeks to avoid the position of the doctrine of mitigation by asserting that it was prevented by the pendency of the Chapter 11 proceeding of Midwestern from taking any steps in regard to regaining occupancy of the premises. It is true that upon the filing of a bankruptcy case, an automatic stay arises by reason of 11 U.S.C. § 362. It is, however, possible to have the stay removed in appropriate circumstances so that normal remedies may be applied. There is no indication in this record that Meyer Dairy made any effort to lift the stay.

In summary, the amounts stipulated or above determined, to be due from Midwestern to Meyer Dairy were: (1) on the note $42,175.21; (2) on open account, $18,412.11; and (3) for rent, $1,147.38. Prorating the amount available in the Midwestern case $39,343.05, among the three categories of debts due to Meyer Dairy gives the following: the note, $26,877.90; open account, $11,732.90; and rent, $732.25. The total claim on account of the first and third categories, those guaranteed by debtors, is $43,322.59. The total amount to be applied against that no account of the first and third categories after prorating totals $27,610.15. This leaves the amount of $15,712.44 as the indebtedness for which the debtor-guarantors are liable in their Chapter 13 plan.

2. The Best Interest of Creditors Test. 11 U.S.C. § 1325(a)(4).

■ The foregoing disposes of the indebtedness aspect of the application of the best interest of creditors test. That test appears at § 1325(a)(4) thus:

.. the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 of this title on such date;
. . .

In the application of that test, the amount of indebtedness to be paid through the plan, $15,712.44, would have to be reduced to present value. *In re Rimgale*, 669 F.2d 426,

8 B.C.D. 874 (7th Cir.1982). The specifics of that exercise need not detain us here in view of the result which we reach.

To complete the analysis required for the best interest of creditors test, it is necessary to know what assets would be available upon a liquidation to be applied to those debts. In this regard, creditor says that debtors own a significant equity in a business enterprise which could be applied to the debt, and which would fully pay the debt upon a liquidation. Debtors dispute this valuation and contend that there is no such value in the enterprise. The hearing dealt with valuation of that enterprise. In its case in chief, to establish value of assets available upon a distribution, creditor relied entirely upon an admission by Vaughn at the § 341 meeting of creditors, that the value of the subject business was in excess of $500,000.00. It is clear, however, that this evidence is insufficient to establish the liquidation value of the interest of debtors in that business.

The subject of the valuation is a company, J.J. Schmidt, which is wholly owned by a company named Happy Time, all of the stock of which is owned by debtors. J.J. Schmidt was purchased by Happy Time from a pair of elderly brothers approximately four years ago in May of 1979, and sellers retain the stock in J.J. Schmidt as security for the purchase price. Payments were to be made to the sellers over a fifteen year period, at the rate of $38,500.00 per year for the first ten years, the amount then to be adjusted. Payments totalling some $113,000.00 had been made through May 1982 to sellers for the benefit of debtors. A balance sheet for J.J. Schmidt was received in evidence. This showed a net worth of just about $400,000.00, though it was testified that the remaining indebtedness to sellers did not appear in the balance sheet. The debtors have the right to sell J.J. Schmidt, providing, of course, that the remaining interest of the sellers is paid out of the proceeds. Debtor Vaughn testified that his interest in J.J. Schmidt was of no value. He based this on the fact that if a payment is missed, he would lose all of his interest in it. We do not think this a valid contention.

Because the evidence established that there is no obstacle to liquidation of J.J. Schmidt by debtors, and further because the Vaughns have paid in excess of $100,000.00 toward the purchase price of the company, and further based upon the balance sheet information of J.J. Schmidt, we have reached the conclusion that a reasonable valuation of the interest which the Vaughns through their Happy Time holding company own in J.J. Schmidt is in excess of the $15,712.44 they owe to Meyer Dairy. In reaching this conclusion we are mindful that the burden is upon the debtor to show that the requisite standards for confirmation are met, those set forth in § 1325. *In re Wolff,* 22 B.R. 510, (Bkrtcy. 9th Cir. 1982); *In re Crago,* 4 B.R. 483 (Bkrtcy.S.D. Ohio, 1980); *In re Elkind,* 4 C.B.C.2d 687, 11 B.R. 473 (Bkrtcy.Colo.1981). This the debtors in this case have failed to do in respect to the standard appearing at § 1325(a)(4).

We hold that we cannot confirm the plan because the objection to confirmation must be sustained. The case will be dismissed.

The foregoing constitutes our findings of fact and conclusions of law.