**In re Francis Gay McLAUGHLIN, Debtor.**

**Bankruptcy No. 97–50303–C.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Jan. 30, 1998.

Sherry R. Gonzalez, Jeffers & Banack, Inc., San Antonio, TX, for Debtor.

Marion Olson, Jr., San Antonio, TX, Trustee.

### DECISION AND ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the chapter 13 plans of Francis Gay McLaughlin, Debtor in the above-styled case, and Victoria Short (collectively, the "Debtors"), and the Renewed Objection to Confirmation of Chapter 13 Plan of Cheryl Williams. Williams raises her objections under 11 U.S.C. § 1325. Af-

ter trial, this court took the matter under submission for closer review. Now, having reviewed the arguments and pleadings of the parties, the plans proposed by McLaughlin and Short, and relevant legal authorities, we conclude that Debtors' plans do not meet the requirements set out in § 1325, and accordingly we deny confirmation.

### FACTUAL AND PROCEDURAL OVERVIEW

The point of departure into our review of McLaughlin's plan and Williams' objection to its confirmation is the $177,031.02 state court judgment that Williams won against Victoria A. Short and McLaughlin in an action for breach of fiduciary duty. Prior to this bankruptcy proceeding, Williams, Short, and McLaughlin had together operated Rainbow Home Health, Inc., a Medicare-financed home health care business. Unfortunately, as sometimes happens in business, the partners had a disagreement, resulting in Williams' dissociation from the venture. In her subsequent state-law suit for breach of fiduciary duty, Williams won partially overlapping judgments of $131,633.06 against Short and $153,432.38 against McLaughlin. The net due Williams is $177,031.02.

After entry of the judgment on the verdict in the 224th District Court in Bexar County, Texas, McLaughlin filed a motion for a new trial, which the trial court denied on December 18, 1996. Although it appears that McLaughlin at first considered appealing the judgment, no notice of appeal was filed within 30 days of the trial court's denial of the motion for new trial, at which time the judgment became final and unappealable. Then, instead of appealing, on January 17, 1997, the thirtieth day after the judgment, McLaughlin and Short filed their Chapter 13 bankruptcy

petitions, shortly after Williams had filed an abstract of judgment perfecting her judgment lien.

The two bankruptcy cases were procedurally consolidated by order of this court on May 8, 1997. With regard to the confirmation of McLaughlin's plan, the principal factual disputes concern the valuation of the debtors' interest in M&S Health Care (formed by Short and McLaughlin after the dissolution of Rainbow) and the value of certain promissory notes allegedly issued by M&S to McLaughlin, and the impact of these valuations on the *bona fides* of the plans, as well as on the liquidation value of the estates. Testimony was given on both sides concerning the valuation issue. The debtors allege that their ownership interests in M&S Health Care are of no value, and that the promissory notes are worthless as well. Williams, of course, argues that both the notes and the debtors' stock in the enterprise is worth some amount.

The upshot of Williams' objection to confirmation is that the plans are not proposed in good faith, but are instead aimed at depriving Williams of her ability to collect on her judgments out of M&S. She also maintains that M&S is worth considerably more than McLaughlin and Short represent in their schedules, and that, therefore, Williams would be better off with a chapter 7 liquidation than she would be under these plans. Thus, she says, the plans do not satisfy the good faith or best interest tests for confirmation in Section 1325.

### LEGAL ISSUES

#### I. GENERAL STANDARDS ON CONFIRMATION

11 U.S.C. § 1325(a) identifies six requirements for plan confirmation.[1] At issue in the

---

1. § 1325(a) provides that:
   "Except as provided in subsection (b), the court shall confirm a plan if—(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title; (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid; (3) the plan has been proposed in good faith and not by any means forbidden by law; (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is

   not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date; (5) with respect to each allowed secured claim provided for by the plan—(A) the holder of such claim has accepted the plan; (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (C) the debtor surrenders the property securing such claim to

present case are the requirements of § 1325(a)(3) and (4), that the plan be proposed in good faith and that it meet the "best interests" or "liquidation test." We note at the outset that a number of cases seem to conflate the two requirements, effectively holding the best interests test to be determinative of the good faith issue. *Public Finance Corp. v. Freeman,* 712 F.2d 219 (5th Cir.1983). *Public Finance* holds that good faith does not necessarily require substantial repayment of the unsecured claims, recognizing only the minimum requirement that no unsecured claim receive less than it would if the debtor's estate were liquidated under Chapter 7. *See also In re Turner,* 168 B.R. 882, 888–89 (Bankr.W.D.Tex.1994) (unsecured creditors entitled to receive at least as much as they would in a Chapter 7 liquidation, determined by the amount they receive net the trustee's percentage fee). As in the instant case, the *Public Finance* court did "not examine a plan which proposes no repayment at all," although there, the "bankruptcy judge found that the unsecured creditors would receive nothing in a liquidation under Chapter 7." *Public Finance Corp. v. Freeman,* 712 F.2d at 221; *see also In the Matter of Chaffin,* 816 F.2d 1070 (5th Cir. 1987). The gist of the cases that do combine the good faith and the best interests requirement seems to be that " 'good faith' is not quantifiable." *In re Burrell,* 25 B.R. 717, 721 (N.D.Cal.1982).

■ This mixing of the two issues is needlessly confusing and serves no apparent purpose. We conclude that the § 1325(a)(3) good faith requirement must be met separately from any consideration of the liquidation analysis required by § 1325(a)(4). *See In re Long,* 10 B.R. 880 (D.S.D.1981).

## II. GOOD FAITH UNDER § 1325(A)(3): THE TOTALITY OF CIRCUMSTANCES TEST

■ *Public Finance* held that "the phrase 'proposed in good faith' must be viewed in light of the totality of the circumstances surrounding the confection of a given Chapter 13 plan." *Id.; see also Chaffin* at 1074 ( "The 'totality of circumstances' test means what it says: It exacts an examination of all of the facts in order to determine the bona fides of the debtor") [2]; *In re Aichler,* 182 B.R. 19, 21 (Bankr.S.D.Tex.1995) (factors include amount of proposed payments, debtor's earning capacity, types of debt sought to be discharged, frequency with which the debtor has sought bankruptcy relief, and the motivation and sincerity of the debtor); *In re Kitchens,* 702 F.2d 885, 888 (11th Cir.1983). And perhaps most important is the discretion *Public Finance* gives the bankruptcy court in determining whether the debtor's plan envisions a satisfactory repayment effort. *Public Finance Corp. v. Freeman,* 712 F.2d at 221; *see also In the Matter of Jasik,* 727 F.2d 1379, 1383 (5th Cir.1984) (bankruptcy court in best position to assess good faith of reorganization proposals). The totality of circumstances test is espoused by a number of other circuits. *See Deans v. O'Donnell,* 692 F.2d 968, 972 (4th Cir.1982); *In re Estus,* 695 F.2d 311, 316 (8th Cir.1982); *In re Metz,* 67 B.R. 462, 464 (9th Cir. BAP 1986).

The court notes at the outset that, given the volume of case law finding and failing to find good faith—with mixed consistency—in a wide variety of circumstances, any attempt to articulate a clear standard for § 1325(a)(3) "good faith" runs the risk of degenerating into total casuistry. The trick seems to be in not placing too much weight on any single

---

such holder; and (6) the debtor will be able to make all payments under the plan and to make payments under the plan."

**2.** On reconsideration, the Fifth Circuit supplemented its *Chaffin* holding with three additional circumstances that might be determinative of good or bad faith. First, "the bankruptcy court should consider whether the payments under the plan fairly [reflect debtor's] ability to pay, considering both his [or her] current and projected future income," although projected income beyond the duration of the plan is not to be considered. *Matter of Chaffin,* 836 F.2d 215, 216 (5th

Cir.1988). Second, in a case where a debt was incurred by fraud, the court ought to consider whether the debtor "concocted the fraudulent scheme with the intent of using bankruptcy proceedings to avoid repayment." *Id.* Finally, although the court has the authority and duty to examine a plan even when no creditor has objected, "the absence of objection is a relevant consideration, for it may lend equity to the debtor's position or indicate that the creditor accepts the plan as honestly filed or believes it is all he [or she] will ever receive." *Id.*

factor, but in the court's looking at how a number of factors in any given case operate together to betray a plan proposed in bad faith. *See generally* L. Clark & S. Lane, "Having Faith in Good Faith Analysis," 683 PLI/Comm 669 (Practicing Law Institute 1994).

■ The litany of relevant circumstances found in the case law includes but is not limited to the debtor's earning potential and past employment history, the duration of the plan, the accuracy of information provided by the debtor, whether the plan is preferential to certain creditors, whether the debt involved would be dischargeable in chapter 7, prior bankruptcy filings by debtor [3], and the sincerity and motivation of debtor. *In the Matter of Tobiason*, 185 B.R. 59 (Bankr. D.Neb.1995); *In re Martin*, 189 B.R. 619, 622 (Bankr.E.D.Va.1995); *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir.1982). Moreover, while the bankruptcy court must consider whether the debtor has stated its assets and liabilities accurately, whether the debtor has made any fraudulent or misleading statements, or whether the debtor seeks unfairly to manipulate the provisions of the Bankruptcy Code, the court must be cautious not to moralize and must recall that one of the central purposes of chapter 13 is to allow the honest but unlucky debtor a "fresh start." *In re Norwood*, 178 B.R. 683, 688 (Bankr. E.D.Pa.1995). Nevertheless, "[i]n examining the factors, the court must bear in mind the public policy that supports the fair and even-handed according of bankruptcy remedies to debtors whose financial distress is not attributable to misconduct on their own part, and who deal fairly and openly with the court and creditors in petitioning for relief." *In re Sitarz*, 150 B.R. 710, 723 (Bankr.D.Minn. 1993). Hence, while we must be mindful of the fresh-start purposes of the Code, and while we are not in the business of punishing debtors for bad things they did prior to

filing, we must be wary of attempts by debtors to abuse the Code's remedies.

■ Accordingly, in addressing the *bona fides* of the chapter 13 plans proposed in this case, we focus on three interacting factors present in these cases. First, Williams directs our attention to the timing of McLaughlin's (and Short's) filing. McLaughlin filed her chapter 13 petition on January 17, 1997, the thirtieth day after the state trial court denied her motion for new trial in the lawsuit underlying the judgment debt to Williams—the very day the judgment became final—without filing an appeal. At that time, McLaughlin was up to date on her other financial obligations. Williams argues that this indicates that McLaughlin's filing is an effort not to rehabilitate her financial affairs but to avoid a single judgment debt, and as such evinces the debtor's bad faith. Williams also points to the Debtor's execution, one day before filing, of a stock purchase option agreement covering her stock in M&S Health Services in favor of the Debtor herself, alleging that this was done in an effort to restrict the marketability of the stock and thereby depress its value.

■ Second, we note that McLaughlin's Third Amended Plan proposes to pay approximately 1.6% of the $153,423.38 judgment in favor of Williams (Short's plan proposes a 1% payout to Class 4 unsecured creditors—presumably Williams—and full payment to all other creditors). Even without discounting the amount to present value, this comes to around $2,455 (in contrast to the 80% McLaughlin's plan proposes to pay other general unsecured creditors and the full payment provided for secured creditors).[4] Courts are divided as to whether substantial repayment (or substantial non-repayment, as the case may be) is a factor relevant to good faith analysis, although it seems clear that

---

3. We note on this point that McLaughlin sought chapter 7 relief, according to her, "in the early 1990s." While repeat filings are a circumstance to be considered under § 1325(a)(3), and while the exact date of McLaughlin's prior chapter 7 discharge may affect the dischargeability of her current debts under chapter 7 (11 U.S.C. § 727(a)(8) denies discharge to any debtor who received a chapter 7 discharge within six years

prior to the filing of the subsequent case) we do not find the evidence of her prior filing decisive as to the good faith of her plan as proposed.

4. Of course, this radically discriminate classification is potentially indicative of bad faith itself and is also subject to scrutiny under 11 U.S.C. § 1322.

substantial repayment, standing alone, is not determinative. *Deans v. O'Donnell*, 692 F.2d 968, 970 (4th Cir.1982) (concluding that the plain language of § 1325 precludes the importation of a per se rule of substantial repayment into the good faith requirement); *In re Goeb*, 675 F.2d 1386, 1388–89 (9th Cir.1982) (declining to impose a substantial repayment requirement for § 1325(a)(3); also noting that § 1325(a)(4) provides a statutory floor for repayment in the liquidation test, but not a substantial repayment requirement); *In re Warren*, 89 B.R. 87, 92–93 (9th Cir. BAP 1988) (following *Goeb*, also drawing distinction between § 1325(a)(3) "good faith" and § 1325(b) "best efforts"); *In re Rimgale*, 669 F.2d 426 (7th Cir.1982) (rejecting a 70% repayment requirement in favor of a "totality of circumstances" test); *In re Terry*, 630 F.2d 634 (8th Cir.1980) (acknowledging problems with substantial or minimum repayment requirement, but holding a zero-pay plan to have been proposed in bad faith). In light of the case law on this point, and in light of our general adherence to a "totality of circumstances" standard, a lack of substantial repayment by itself is not determinative of good faith, but, when combined with other circumstances, may be one of many factors to be considered. For our purposes, we note that McLaughlin's plan proposes to pay a woefully small fraction of Williams' judgment debt, while paying most of her other debts. Standing alone, this point is not decisive, but, taken together with other facts present in this case, does tend to tilt the scales away from a finding of good faith.[5]

■ The third key factor here is the relationship between McLaughlin's and Short's filings and plans on the one hand and their pre-petition conduct, giving rise to the state court judgment debt, on the other. While we do not pass judgment on McLaughlin's and Short's pre-petition dealings with Williams, as part of the "totality of circumstances," pre-petition conduct can fairly be considered by a court in its § 1325(a)(3) analysis. *See Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir.1986) (although debtor's pre-petition culpability not a basis, standing alone, for denying confirmation, it is relevant factor in a § 1325(a)(3) good faith inquiry); *In re LeMaire*, 883 F.2d 1373 (8th Cir.1989) (pre-petition conduct relevant though not controlling; although debtor shot at creditor nine times, scoring five hits, intending to kill him and nearly succeeding, plan confirmable where debtor had served prison sentence, plan proposed a substantial repayment of the underlying civil judgment, and debtor and parents made considerable sacrifices to fund the plan).

■ Plaintiff argues that where a debtor, like McLaughlin or Short, seeks bankruptcy protection principally as an antidote to a debt incurred by the breach of a fiduciary duty, there is evidence of bad faith. "The legal and/or personal relationship between the debtor and the objecting creditor should be considered. If the relationship was a fiduciary one in a legal sense, or involved a substantial degree of personal trust in a factual sense, the causative role of a breach of that trust in the injury to the creditor bears on whether the debtor is in good faith invoking Chapter 13." *In re Sitarz*, 150 B.R. 710, 722 (Bankr.D.Minn.1993) (noting also the suspicious cocktail of pre-petition conduct and subsequent proposal of a low-percentage composition plan). In *Sitarz*, the court found, as we are inclined to find here, that the debtor did not attempt to be evasive or dishonest in the actual process of filing and disclosing its various assets and liabilities.[6]

---

**5.** We also note that many of the circuit level cases addressing substantial repayment as an indicator of good faith arose before the addition to the Bankruptcy Code of the "best efforts" requirement in 11 U.S.C. § 1325(b) in 1984. While we agree that the ratio of repayment proposed to pre-petition obligation is one of many factors relevant to the question of good faith under § 1325(a)(3), we think that, functionally, the issue of the quantum of repayment is addressed more squarely in the "best interests" or "liquidation" test of § 1325(a)(4) and the "best efforts" test of § 1325(b).

**6.** Williams argues that the low valuation McLaughlin gives her stock in M&S Health Care in her schedules shows her bad faith. While it is plausible that this was an intentional evasion on the part of McLaughlin, we also recognize that McLaughlin did at least nominally list all of her assets and that the valuation of stock in a closely held corporation is in most cases debatable—it is not as if she listed 2,500 shares of Intel stock as

But *Sitarz* went on to examine the debtor's pre-petition conduct (violation of a fiduciary duty leading to a substantial judgment entered in favor of the objecting creditor) in relation to the proposed treatment of the creditor under the plan and the implications that this proposal had for the debtor's and the objecting creditor's respective economic and legal positions. *Sitarz* held that "[w]here...the sole debt to be adjusted directly resulted from the betrayal of a close personal relationship, the breach of strong personal trust, and felonious conduct in that breach, the proposal to obtain a discharge under Chapter 13 amounts to an unfair manipulation of the Bankruptcy Code." *Id.* at 725.

■ On the other hand, a "Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims." *Neufeld v. Freeman,* 794 F.2d 149, 153 (4th Cir.1986); *see also In re Thorsted,* 157 B.R. 5, 9–10 (Bankr.E.D.Va.1993); *In re Martin,* 189 B.R. 619, 622–23. In *Martin,* despite the existence of a substantial judgment against the debtor and in favor of the objecting creditor, the bankruptcy court found the plan to have been proposed in good faith. The court there noted, however, that the debtor had attempted to negotiate a settlement, and had made voluntary payments toward the judgment and been subject to salary garnishment for ten months prior to seeking bankruptcy protection. Here, we see no indication of such mitigating factors.

In the instant case, then, we find the constellation of three factors to be determinative: the debtors' pre-petition conduct leading to the judgment, the timing of the debtors' petition in relation to that judgment (and the timing of their failure to appeal that judgment), and the extremely unfavorable treatment that the objecting creditor receives under the terms of the proposed plan. We would not deny confir-

mation to "penalize" the debtors for the presence of any one of these factors. However, the synergistic effect of these factors leads us to the conclusion that these plans have not been proposed in good faith.

### III. BEST INTERESTS TEST OF § 1325(a)(4)

■ Does the proposed plan meet the best interests or liquidation test set out in 11 U.S.C. § 1325(a)(4)? Section 1325(a)(4) requires that, for a plan to be confirmed, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7." Williams argues that the amount which the plans propose to pay on McLaughlin's and Short's judgment debts to her is less than she would receive were the Debtors' estates to be liquidated under chapter 7.

The "best interests" test requires the debtor to establish the net present value of the payment that McLaughlin's plan proposes to make on the judgment debt to Williams. That number must then be compared to what Williams might receive were McLaughlin's and Short's estates to be liquidated in chapter 7. McLaughlin's plan proposes to pay $2,455 of her $153,423.38 debt to Williams, while Short's proposes to pay $1,311 of her $131,633.06 debt. Even without discounting these proposed sums, this amounts to approximately 1.6% for McLaughlin and 1.0% for Short. The discounted value of this stream of payments is of course even less. There is little or no factual disagreement over how little is proposed to be paid. The real dispute centers on what Williams would receive in a liquidation under chapter 7 were the case converted. That requires a more detailed examination of the two categories of assets having the most significant impact on that analysis, the promissory notes each debtor holds from M&S, and the stock of M&S held by each debtor.

valueless. For purposes of the good faith analysis, we find McLaughlin's valuation of the stock to be a peripheral issue at best, and we find other factors more relevant to this issue. However, the

valuation of said stock is central to our analysis of the best interests test under 11 U.S.C. § 1325(a)(4), which we address later.

## A. *The Promissory Notes*

Allegedly, M&S Health Care has had at some time on its books several promissory notes in the favor of McLaughlin and Short. Evidently, these notes originated in salary due McLaughlin and Short from M&S that M&S could not afford to pay at the time. Because HCFA regulations require that M&S be operated on a not-for-profit basis, the only value that McLaughlin and Short as owners could take out of the enterprise was the salary.

When the company did not have adequate cash to pay McLaughlin and Short the salary they were due, they had M&S issue promissory notes for the balance. Payment by M&S on such notes is treated as an expense reimbursable by Medicare, but only if the notes are in fact repaid within a certain time. Notes which are repaid after one year are no longer treated as a reimbursable expense by Medicare. Therefore, at the end of the relevant time periods, McLaughlin and Short (on the advice of their accountant) had M&S pay off the notes in order to record the reimbursable expense. Mindful of cash flow restraints, however, the Debtors would not actually *cash* the checks, but would instead "return" them to the enterprise, which would in turn issue new notes to McLaughlin and Short. Thus, they directed M&S to "roll over" the notes that McLaughlin and Short had taken in lieu of salary for that year at the end of the year. These new notes were not subject to the HCFA limitation on the time within which they could be repaid, but repayment of the new notes was also no longer an expense reimbursable by Medicare. Because eventual payment on the notes was (and continues to be) contingent on M&S' cash flow, McLaughlin argues that they are now essentially worthless. Williams, on the other hand, views them as valuable assets subject to liquidation.

In her exhibits, Williams shows only one current note to McLaughlin, dated December 31, 1996, with a face value of $11,480.75. Also attached is a previous note to McLaughlin for $40,583.07, but with a notation that $29,102.32 was "paid" on December 31, 1996 (the difference between $40,583.07 and $11,480.75). Likewise, Plaintiff's exhibits include

a copy of a promissory note in favor of Short for the amount of $29,102.32, which also has a notation stating that it was "paid" on December 31, 1996. The payment is further evidenced by M&S checks to McLaughlin and Short dated December 31, 1996, in the amount of $29,102.32 each. McLaughlin insists that she in fact returned the $29,102.32 check to M&S, though it is not clear whether this was in return for additional stock, or as a contribution to "working capital," or in exchange for an additional note. We see no evidence in the record of any additional stock or notes being issued after December 31, 1996. It is difficult, then, to establish conclusively the value of any notes outstanding as of the confirmation hearing.

If the only asset in McLaughlin's estate were this note, and if the only note in existence were the one to McLaughlin dated December 31, 1996 in the amount of $11,480.75, we would be forced to make a determination of the fair market value of the note, taking into account its collectability in a chapter 7 liquidation. The McLaughlin plan proposes 1.6% payment to Williams, or approximately $2,400. In a chapter 7 liquidation, McLaughlin's claim would consume approximately 93% of net assets after the payment of trustee expenses. Assuming expenses of approximately 5%, *see* 11 U.S.C. § 326, Williams would be entitled to a recovery of 93% of $11,480.75 less 5% ($10,906), or $10,143.00.

Rather than pursue an extended discussion whether the note ought to be deeply discounted as McLaughlin maintains, however, we elect to turn to what proves to be the dispositive factor for liquidation analysis purposes—namely, the value of the stock of M&S itself.

## B. *The Value of Stock in M&S Health Care.*

The main subject of the dispute is the value of McLaughlin's and Short's stock in M&S Health Care. McLaughlin argues that, because of HCFA regulations concerning who can own stock in such enterprises (which must be owner operated) the stock itself is worthless. Upon reviewing the expert testimony presented at trial concerning the valua-

tion of M&S, our inclination is to disagree. The value of such an enterprise, since it has few hard assets such as a physical plant, equipment, or inventory, is to be deduced by examining the projected income stream tied to such attributes as its license and client base. At trial, we heard testimony from J. Lowell Goode, a Certified Public Accountant with substantial experience in business appraisal, who performed a valuation of M&S based on the estimated future revenue stream of the enterprise. Based on his analysis of M&S' projected income and his research on the home health care industry, Goode concluded that M&S has a value of between $200,000 and $290,000. Based even on the lower estimate of $200,000, if M&S were liquidated, McLaughlin's and Short's unsecured claim holders would certainly receive more than the 1.6% and 1% on their claims that their respective plans propose to pay.

McLaughlin's plan proposes to pay $1,437.24 a month to the trustee, with a projected distribution to all creditors over 60 months of $77,610.96 (net of the trustee's fees). A substantial portion of this distribution is earmarked for several secured and specially classified unsecured creditors. More saliently, however, are the plans' proposals to pay Williams approximately 1.6% of McLaughlin's $153,423.38 and 1% of Short's $131,633.06 judgment debt, or approximately $2,455 and $1,316, respectively. Of approximately $287,000 of liabilities listed in her original schedules, McLaughlin shows approximately $90,000 as secured debts (secured by her residence, automobiles, and some additional personal property), all but one (Sears Roebuck) of which are listed in the plan as at least fully secured.[7] McLaughlin is left with approximately $165,000 in unsecured debts, approximately 93% of which consists of Williams' judgment debt. Short's plan proposes an $8,290.80 payout on a total of $187,430.55 total unsecured debt. Assuming M&S were sold for $200,000, and the proceeds were divided equally, McLaughlin and Short would each receive $100,000,

approximately 60% of McLaughlin's and 53% of Short's unsecured debts, considerably more that the 14% McLaughlin's and the 4% Short's plan proposes to pay unsecured claims overall, and far more than the 1.6% and 1%, respectively, their plans propose to pay Williams. Based on this analysis, even without calculating the net present value of the plans' proposed payouts to Williams and the other unsecured claim holders, McLaughlin's and Short's plans do not meet the best interests test of § 1325(a)(4).

Overall, the court is comfortable with the valuation testimony of Mr. Goode. He employed credible and recognized valuation techniques, taking into account the nature of the current market for such businesses, the attendant risks of relying on Medicare reimbursement for one's revenue stream, and the need for working capital to carry what can be a relatively long "turn" between expenses incurred and revenue recovered. He also found comparable sales of such businesses which confirmed that his net income valuation was within range. Goode's task was to value M&S as a going concern because a trustee in McLaughlin's bankruptcy would be selling the stock of M&S, not its assets. M&S is itself not in bankruptcy, so that a willing buyer could step in and take over. Goode also gave substantial weight to the current strong interest in such enterprises, an interest motivated less by their current net income than by the value to a purchaser of the license and the customer lists of the enterprise. These items may be worth substantially more in the hands of a well-capitalized buyer than they are to the current debtors. Overall, Goode's approach was conservative.

Goode's analysis is not, of course, above scrutiny, and we note some potential weak spots. First, the valuation of M&S used for this analysis is on a going-concern basis, i.e. the amount to which a willing seller and a willing buyer would agree absent compulsion to buy or sell. A trustee in bankruptcy might not be able to market the stock to

7. We note that McLaughlin's original schedules and her first proposed plan showed $31,000 in legal fees as a priority claim, which included $28,000 for an appeal of the state court judg- ment. Because the appeal was not taken, the priority claim for legal fees was removed form McLaughlin's amended plan.

achieve a going concern value, however. If McLaughlin were to refuse to further operate the business, the trustee might have somewhat greater difficulty in achieving full value for the stock.[8] In addition, we would have to factor in the trustee's costs of administering this particular asset, likely to include not only the trustee's commission but also the commission of a broker specializing in the sale of such businesses as this (costs which we estimate here to be in excess of 15%). These factors would certainly have to be taken into consideration, and would have the effect of somewhat diminishing the value expected to be recovered from the value stated by Goode. *See In re Piece Goods Shops Co., L.P.,* 188 B.R. 778 (Bankr.M.D.N.C.1995) (value of property to be received under a chapter 11 plan—equity in the reorganized debtor—based on the projected going concern value, which, for purposes of the best interests test, the court compared to the liquidation value); *see also In re Gatton,* 197 B.R. 331, 332 (Bankr.D.Colo.1996) ("we are not to just mechanically determine the amount of nonexempt equity and use that as the 'amount that would be paid' "); *In re Barth,* 83 B.R. 204, 205–06 (Bankr.D.Conn. 1988) (in performing best interests analysis, expenses of a hypothetical chapter 7 liquidation must be accounted for; but places burden on *debtor* to establish liquidation expenses); *In re Dixon,* 140 B.R. 945, 947 (Bankr.W.D.N.Y.1992) (approving a 10% cost-of-sale figure not as a "blanket assertion" but as a fact); *In re Vaughn,* 28 B.R. 550, 554 (Bankr.S.D.Ohio 1983); *In re Clements,* 185 B.R. 903, 908 (Bankr.M.D.Fla.1995); *but see In re Frazier,* 33 B.R. 175, 176 (Bankr.D.Md.1983) (fair market value used is not a special "forced sale value").

Second, the record does not support the conclusion that McLaughlin and Short (or their respective trustees) would simply divide the proceeds of sale of the stock $200,000–$290,000 and take their respective portions to the bank. There is a likelihood that the proceeds from the stock sale would be subject to taxation. *In re Gatton,* 197 B.R. at 332 (considering capital gains tax that would be payable by trustee upon liquidation of stock). Also, each debtor owns only 50% of the stock, so that, in each estate, neither trustee could sell a controlling interest in the enterprise, a factor which would no doubt reduce the price a trustee could expect to receive (unless the trustee of both estates could sell both packages of stock as a unit). Overall, then, while $200,000 to $290,000 might sound like a tidy sum of money, it may somewhat overstate the amount which a chapter 7 trustee could expect to receive for the stock of M&S.

Nonetheless, M&S is clearly worth something as a going concern. Granted, McLaughlin is under no obligation to keep M&S in operation, and if she were to shut it down its value would probably decrease by some factor. But the evidence has established that, in this industry, an operating license and client list alone make up a valuable asset, even in the temporary absence of operations. The facts in the record show that it is a profitable venture in a growing industry. Even given the HCFA restrictions on who can own and operate such a firm, the income stream associated with the license and the patient list would be very attractive to a person qualified to own and operate one of these business—a nurse, a hospital manager with an MBA, for example—so that Goode's valuation must, at the end of the day be given substantial credence.

Given the paltry amount the Debtors' plans propose to pay Williams on the judgment debts, it does not take a very high liquidation value for these plans to fail the best interests test. In this regard, we note that the amounts which McLaughlin's and Short's plans propose to pay Williams (1.6% of $153,423.38, or approximately $2,455 for McLaughlin and 1% of $131,633.06, or around $1,316 for Short), are not even equal to the par value of their stock in M&S. Discounting this payout to present value (as the statute requires) only pushes the debtors farther from meeting the best interests requirement. In order for these proposed distributions to meet the best interests test, we would have

---

8. We say "somewhat" because, in this industry, significant value attaches to the license and the customer lists, such that a temporary cessation of operations might not have all that adverse an impact on the stock value, so long as it did not impair the license or the customer list.

to assume a liquidation discount on Goode's valuation in excess of *90%*. The record will simply not support a discount of that magnitude. At most, when taking into account the impact of the Debtors' likely refusal to continue to operate M&S in the event of the conversion of their cases to chapter 7, the difficulty of selling only 50% of the stock at a time, and the costs associated with liquidation, a discount of no more than 40–50% could be contemplated. Even so, the stock of M&S would exceed $100,000, taking the lowest end of Goode's valuation range, of which some $93,000 would be payable to Williams (or some $46,500 in each estate, more or less). One need be no more precise with the math than this, because the amount to be realized in a chapter 7 liquidation would so obviously exceed the $2,400 which McLaughlin's plan promises to Williams.

Therefore, we hold that M&S' value for purposes of the liquidation test exceeds the amount that Williams would receive under the proposed plan, and that McLaughlin's and Short's plans therefore fail the "best interests" test set forth in 11 U.S.C. § 1325(a)(4).

IV. THE BEST EFFORTS TEST IN 11 U.S.C. § 1325(b)

Williams also argues that McLaughlin's plan fails the best efforts test set forth in 11 U.S.C. § 1325(b). According to this court's previous holding in *Turner*, "[t]he 'best efforts' test functions primarily to assure that unsecured creditors will receive not just the minimum but the maximum possible in satisfaction of their claims." *In re Turner*, 168 B.R. at 889. Under § 1325(b), once the trustee or an unsecured claim holder objects, the court may not confirm a chapter 13 plan unless the plan proposes full payment on the claim or, more relevant to the case here, the debtor shows that all projected disposable income for a three year period has been dedicated to the plan. 11 U.S.C. § 1325(b)(1) and (2); *see also In re Jobe*, 197 B.R. 823, 826 (Bankr.W.D.Tex.1996). However, the "best efforts" test is not a substitute for or an alternative to the good faith and liquidation requirements set out under § 1325(a); rather, a debtor is put to the

"best efforts" test only after the trustee or an unsecured creditor objects despite the proposed plan's meeting the requirements of § 1325(a). *See In re Warren*, 89 B.R. 87, 94 (9th Cir.1988). Because the plans proposed in this case meet neither the good faith nor the best interest requirements of § 1325(a), we do not reach a consideration of best efforts under § 1325(b).

### CONCLUSION

In light of the foregoing considerations, that the Debtors' plans neither have been proposed in good faith nor meet the best interests of the unsecured creditors, this court concludes that the plans as proposed are not confirmable.

So **ORDERED**.